The CHESAPEAKE AND OHIO RAIL-WAY COMPANY, a corporation, Plaintiff,

v.

BAILEY PRODUCTION CORPORATION, a corporation, Defendant.

The CHESAPEAKE AND OHIO RAIL-WAY COMPANY, a corporation, Plaintiff,

v.

The LORADO COAL MINING COMPA-NY, a corporation, Defendant and Third Party Plaintiff (Bailey Production Corporation, a corporation, Third Party Defendant).

Civ. A. Nos. 873, 874.

United States District Court
S. D. West Virginia,
at Huntington.

July 23, 1958.

Amos A. Bolen (Fitzpatrick, Marshall, Huddleston & Bolen), Huntington, W. Va., for Chesapeake & Ohio Ry. Co.

C. H. Hardesty, Jr. (Furbee & Hardesty), Fairmont, W. Va., and S. S. McNeer (Campbell, McNeer & Woods), Huntington, W. Va., for the Lorado Coal Min. Co.

John B. Meek (Scherr, Meek & Vinson), Huntington, W. Va., for Bailey Production Corp.

HARRY E. WATKINS, District Judge.

These consolidated actions are for damages caused by a landslide on March 6, 1955, when a section of plaintiff's railroad tracks was inundated by a great quantity of earth, stone and debris which slid down after a period of heavy rain from the mountainside above the tracks. By stipulation, the parties have agreed that the plaintiff railroad is entitled to judgment for $12,500 from one or both of the defendants in payment for damages sustained from the landslide. By such stipulation, this Court, sitting without a jury, is asked to determine which of these defendants created the condition which caused the slide, and is therefore responsible, as between the two defendants, for such damages, or if both parties contributed thereto, what proportion of the damage is attributable to each. Thereby, the issue of negligence is eliminated, and this Court is asked to render judgment against the defendant which created the condition that caused the slide. Jurisdiction is based upon a diversity of citizenship.

### Findings of Fact

In 1948, and prior thereto, defendant Lorado Coal Mining Company was producing coal by conventional deep mining methods with a tipple at Lorado, Logan County, West Virginia. By a written agreement of October 22, 1948, Lorado engaged defendant Bailey Construction Corporation (the name has since been changed to Bailey Production Corporation) to produce, for Lorado, by the strip mining method, as an independent contractor, all merchantable coal along the outcrop of certain seams of coal in land which Lorado had leased. The present controversy arises from operations carried out in the Stockton seam of coal, which is the topmost seam of coal in the mountain.

From February, 1949, until December, 1950, Bailey conducted stripping operations in the Stockton seam, hauling the coal thus produced by truck to a bin provided by Lorado at the level of the Stockton seam. The coal was then moved down the mountainside by means of a rope and button conveyor maintained by Lorado, to Lorado's tipple, where the coal was processed and loaded onto railroad cars. The strip mining by Bailey required the removal of extensive overburden from the coal, consisting of heavy sandstone deposits located immediately above the layer of coal, a comparatively thin layer of topsoil, and a growth of small timber. The removal of this overburden was accomplished through the use of some 70 pieces of earthmoving equipment such as power shovels, bulldozers, trucks, etc., with the assistance of explosives. Additional waste material developed during the stripping operation and had to be removed, as a shale binder or parting between the veins of coal had to be separated from the coal. The Stockton seam in this area averaged around 18½ feet thick, composed of three separate veins of coal of 4 to 5 feet depth, divided by two layers of binder 2 to 3 feet thick. In some areas of the job one or more of these upper veins of coal was oxidized near the surface and had to be discarded, yet it was necessary to remove that unmerchantable coal in order to gain access to the lower vein or veins.

Generally, during the stripping operation this collection of overburden, waste coal, and binder material, colloquially known as strip spoil, was dumped over the mountainside as it was removed on the first cut—that is, a strip of perhaps 30 feet cut around the mountain, at the level of the coal. Then as the second and succeeding cuts were made, digging farther back in the mountainside, the spoil

material was piled into the pit where the coal had been removed in the preceding cut. In other words, the waste materials were normally cast to the downhill side as they were excavated, and as these waste materials piled up at the outer edge of the strip, a mound was formed up to 25 feet in height, called a low wall. At some points the entire top of the hillside was levelled; at other places the strip was dug back into the mountainside leaving what is called a high wall, or a sheer facing in the overlying strata exceeding at times 80 feet.

Bailey claims that Lorado had made an exploratory excavation in the Stockton seam somewhere above Tank Hollow, to determine the quality of the coal and the size of the vein, before negotiations for the contract of October 22, 1948, and the stone, dirt, oxydized coal, etc., dug at that time was cast over the mountainside. I find that this hand excavation did not contribute any important part of the material which triggered the landslide of March, 1955. No earthmoving machinery was used in digging this test hole, and a comparatively small hole was dug back into the mountainside to allow inspection of the coal. I must reject Bailey's contention that this was the cause, or a significant helping cause, of this landslide of over 17,000 cubic feet. The amount of strata moved during this minor operation is totally inconsequential when compared with the vast amount of earthmoving encompassed by Bailey's strip mining in that vicinity.

Bailey also claims that a contributing cause of the landslide was waste material cast into Tank Hollow during the excavation for the rope and button conveyor, for which Bailey claims Lorado is responsible. This is mere conjecture on the part of Bailey, however, for none of Bailey's witnesses was present at the scene during the landslide to see how much of the conveyor excavation material was included. Lorado's superintendent, Workman, and a former engineer for Lorado, Rush, both witnessed the slide, and both say that the conveyor excavation material made up a very minor portion of the slide. Their testimony was that the slide originated to the east and above the conveyor excavation material, and that only an edge of the slide caught the conveyor waste as the slide progressed down the mountainside. This testimony is uncontradicted, and is supported by the three expert witnesses who were able to definitely establish the place of origin of the slide from the physical features found at the site such as exposed bed rock. These features are visible also in some of the photographs in evidence here. It is clear that the excavation for the conveyor was some distance from the origin of the slide, and only the edge of the slide caught some of the conveyor excavation material. The cause of the slide was the strip spoil amassed above Tank Hollow, and I find that only a negligible amount of conveyor excavation material went into the slide of March 5, 1955.

Lorado alleges that the slide in question was caused by Bailey's dumping strip spoil over the mountainside above Tank Hollow, where the slide originated, as Bailey removed the overburden, binder, etc., in the process of its stripping. Bailey contends that it trucked away all the overburden from the area above that particular ravine while making the first cut, in order to keep from damaging the water tanks and railroad tracks at the foot of the hollow. Bailey says it hauled that waste material over to an adjoining hollow and dumped it over the hill, where it has caused no damage. Lorado's superintendent replies that the road was torn up to such an extent that it was impossible to truck away the overburden during the first cut.

On the other hand, Bailey contends that Lorado used a power shovel to cut a mine track road along the mountainside above Tank Hollow, between the high wall and the low wall, after Bailey had completed stripping, and that Lorado cast strip spoil over into the hollow while making that roadway which caused the slide in controversy here. Lorado admits it leased a power shovel, with operator, from Bailey for 3 shifts, 32½ hours, to

level off a roadway to a mine portal Lorado was putting in the high wall of the Stockton seam at the conclusion of Bailey's operations, but denies that any spoil was dumped over the hill during that road leveling work.

Unfortunately, some of the men whose testimony would have been most helpful are dead, out of the state or country, or their whereabouts are unknown. The evidence which was adduced at the trial, mostly from employees or former employees of the two defendant companies, is highly contradictory and in some vital details the testimony is quite vague, apparently due to the passage of some 9 years since the occurrences took place. The testimony of Lorado's expert witnesses (two engineers and a geologist) was necessarily limited since they were not on the scene during any of these mining operations. However, the evidence which was presented is clear and convincing to me and I find that Bailey is the party responsible for plaintiff's damages. Taking into consideration all the evidence and further considering the credibility of the witnesses, including their demeanor on the stand, their interest in the outcome of the case, if any, their ability to know the things about which they testified, and the reasonableness of their testimony, I find that Bailey Construction Corporation created the condition which caused the landslide of March 6, 1955, by piling strip spoil on the mountainside over Tank Hollow during the time it was stripping coal in the Stockton seam. The stipulation provides that this Court shall render judgment for $12,500 against Lorado or Bailey, whichever was responsible for such damages. Therefore, the plaintiff is entitled to recover that amount from Bailey.

Workman and Rush were both familiar with the area above Tank Hollow prior to 1948, and testified as to the small timber which had been present all along the Stockton outcrop area. Their testimony in this respect is substantiated by an aerial photograph taken in 1945. The evidence is clear from both testimony and photographs that this area is now denuded of timber down 300 feet below the coal level, with coal, slate and rock strewn at various depths all down the mountainside into Tank Hollow. Maps and testimony of the expert witnesses indicate that the slope which now exists from the top of the low wall mound down into Tank Hollow is a much steeper slope than previously existed in the original slope of the hillside prior to stripping, and is steeper than that generally considered by engineers as the normal safe angle of repose for unclassified materials. Bailey moved a great deal of overburden in that area, which must have taken a considerable length of time. Lorado Exhibit 26, an aerial photograph taken in 1958, graphically portrays the extent of the strip spoil which has been dumped into or has eroded into Tank Hollow. It is not reasonable to say that all these tons and tons of strip spoil were placed in position by Lorado in only 32½ hours with one shovel and that Lorado's actions caused the landslide. The type and quantity of strip spoil which has come down into Tank Hollow parallels that which has come down other ravines in the vicinity, which Bailey admits was caused solely by its strip mining operations in the other ravines.

It may be that Bailey trucked away a part of the overburden as it was removed in the first cut above Tank Hollow, although the evidence is conflicting on that. But more than one cut was made in that area, and there is no evidence that the overburden was hauled away in the second or succeeding cuts. In fact Harold Bailey's testimony was to the effect that a berm of spoil was built up 8 feet high along the brink of the hillside at the level of the first cut, to prevent boulders from rolling down into Tank Hollow during the blasting of stone with dynamite, and then as the overburden was removed in the second cut it was piled up in the pit which had been dug in the removal of coal on the first cut. Bailey had a selfish interest in not casting boulders over the mountainside in such a manner as to destroy the water

tanks or railroad tracks at the tipple, because these facilities were needed to keep the tipple in operation to process the coal Bailey produced. Bailey was successful in keeping the waste material from damaging those facilities during the time actual stripping was going on. However, 5 years after the stripping ended, the low wall spoil pile became saturated with water which added to its weight and lubricated it, and the landslide ensued. The evidence indicates that there had been other landslides in the area, so that it was foreseeable that if the strip spoil were piled up above Tank Hollow by Bailey, a landslide in that area would likely come about.

Dr. Paul Price, a noted geologist from West Virginia University who has had wide experience in making studies on the causes of landslides, made a thorough examination of the premises around and above Tank Hollow on May 31, 1955, less than three months after the slide had occurred. He was not employed by any of the litigants in this action and his report was made almost 2 years before this action was instituted. His very complete and revealing report contains the following conclusions:

> "It [Stockton seam] is overlain by a massive gray sandstone that here appeared to attain a thickness of 60 to 80 feet. It is, of course, this sandstone which comprises the majority of the spoil bank. It would be and was physically impossible to shoot or blast and cast an overburden of this type, composed principally of large fragments, into a spoil bank and on a mountain side with a slope similar to this one without having it strewn from the top to the base of the mountain.
>
> \*　\*　\*　\*　\*　\*
>
> "Liability for damages appear to be a legal decision. I have attempted only to interpret what actually occurred and how it occurred. Whatever position your Company takes it should recognize that even though the most recent landslide (March

5th) occurred below the present strip spoil bank and did not include it, the greater amount of material which moved down the mountain side, into the valley and over the railroad tracks, originated from and by the coal stripping operation."

These observations by an eminent independent expert, made shortly after the slide took place, as substantiated by the evidence in this case, must be given great weight.

It was originally contemplated by all concerned that it would take 6 years to remove the 1½ to 2 million tons of available coal in this area by the strip mining process. However, in September, 1950, when much less coal had been produced, it was discovered that the remaining coal was oxydized and unmerchantable. After oral notice to Lorado, Bailey, with consent of Lorado, discontinued its stripping operations and removed its equipment. Bailey obtained a release of its bond previously given the West Virginia Department of Mines.

The agreement of October 22, 1948, contained a provision whereby Bailey agreed:

> "To indemnify and save harmless [Lorado] by reason of any of the acts of [Bailey] or the acts of its employees in and about the prosecution of its strip mining operations under the terms hereof."

Lorado has introduced uncontradicted evidence here showing that when the present action was instituted, Lorado as indemnitee called upon Bailey as indemnitor to defend Lorado in this action. Bailey did not come forward to defend Lorado, and Lorado has incurred liability for counsel fees and costs in the sum of $7,478.38. This includes $1,310.30 for services of R. M. McCoy, for engineering services and preparation of exhibits, and the sum of $6,168.08 for legal expenses incurred in preparation for trial. Bailey has made no objection to the reasonableness of this sum, and I find it to be reasonable. I also find that Lorado acted in good faith and with due diligence in de-

fending itself in this action. The Court having absolved Lorado from any responsibility for plaintiff's $12,500 damages, Lorado seeks to recover from Bailey the $7,478.38 attorneys fees and costs.

### Conclusions of Law

1. This Court has jurisdiction of the parties and the subject matter of this controversy.

2. There can be no doubt of an indemnitee's right to recover from an indemnitor reasonable counsel fees and costs incurred in resisting a liability indemnified against. 27 Am.Jur., Indemnity, § 27; 42 C.J.S. Indemnity § 13d. Bailey resists all liability under its indemnity contract with Lorado, both for damages and costs, on the ground that the contract of October 22, 1948, was terminated by mutual agreement, and urges that the indemnity protection ceased to exist after the date of the termination of the contract. I must reject this argument by Bailey. It is not contested that Bailey's actions in stripping the Stockton seam of coal (which I have found created the condition which caused plaintiff's damage) took place prior to the discontinuance of Bailey's strip mining operations. The mere fact that the landslide damage took place after Bailey had ceased work under the contract does not relieve Bailey from the consequences of his acts done under the contract. Bailey cites no authorities to sustain its tenuous position. In the absence of any language to the contrary in the contract itself, or of any agreement on the matter at the time of the cessation of operations, the only fair interpretation which can be attributed to the indemnity feature of the contract is that it was intended to cover just this type situation which gave rise to this litigation. I conclude that Lorado is entitled to recover its costs in the amount of $7,478.38 from Bailey by reason of the indemnity agreement.

3. The release of Bailey's stripping permit and bond by the West Virginia Department of Mines does not affect Bailey's legal responsibility for its actions. As stated in Oresta v. Romano Bros., 137 W.Va. 633, 73 S.E.2d 622, 627:

"With respect to the contention of the defendants that they were not guilty of negligence because in mining and removing the coal they conformed to approved and recognized method of strip mining, it should be said that compliance with such mining method does not excuse, or constitute a valid defense against, the consequences of their negligence in locating, constructing, and maintaining the embankment on the steep slope of the hill * * * ."

4. Bailey Construction Corporation's actions in stripping the Stockton seam of coal above Lorado's tipple was the proximate cause of plaintiff's damages of $12,500, and plaintiff shall recover that amount from Bailey.

Counsel may prepare an order in accordance with the opinions expressed above, which, when entered, shall constitute a final decision in this case within the meaning of 28 U.S.C.A. § 1291.