Mitchell **WATSON** et al., Plaintiffs-Appellants,

v.

**KENLICK COAL COMPANY, INC.**, et al., Defendants-Appellees.

No. 73–2234.

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1974.

Decided June 21, 1974.

William H. Allison, Jr., Louisville, Ky., for plaintiffs-appellants.

Donald Combs and William J. Baird, Pikeville, Ky., for defendants-appellees.

Before PHILLIPS, Chief Judge, and MILLER and LIVELY, Circuit Judges.

PHILLIPS, Chief Judge.

Plaintiffs-Appellants ("the Watson family" or "the Watsons") claim that the destruction of surface rights in land owned by them incident to past and prospective strip mining by the defendants-appellees is actionable under 42 U.S.C. § 1983. They sue for an injunction and damages. Specifically, the Watson family contends that appellees, who admittedly own the minerals in, on and under the Watson land, are acting under color of state law and depriving them of their property without due process and just compensation, all in violation of the Fourteenth and Fifth Amendments.

District Judge H. David Hermansdorfer, finding no state action or constitutional deprivation, dismissed the complaint for lack of subject matter jurisdiction. His decision is reported at 365 F.Supp. 456 (E.D.Ky.1973). We affirm.

The Watsons are private citizens who own the surface rights to certain land located in Magoffin County, Kentucky. Defendants-appellees, the Howards, are private citizens who own the minerals, including coal, in, on and under the land. The Howards derived their rights as remote successors in interest of a mineral severance grant or deed from the former owners-predecessors of the title to the Watsons. Defendants-appellees, the Kenlick Coal Co., Inc. and the Tip Top Coal Co., Inc., are lessees who engage in strip mining the land. Defendants-ap-

pellees, the Baileys, are officers of the coal companies.

The gravamen of the complaint is that the appellees, without the Watsons' consent, have been strip mining the land; and that these strip mining operations have resulted in the destruction of the Watsons' surface rights in the land and constitute a denial of due process and a taking of the land without just compensation. State action is premised upon the issuance of permits to strip mine by the Division of Reclamation, a division of the Kentucky Department of Environmental Protection, or, in the alternative, upon decisions of the Court of Appeals of Kentucky in unrelated cases.

■ A prerequisite to the vesting of federal jurisdiction for an alleged wrong under § 1983 is the deprivation of a right guaranteed by the Constitution and laws of the United States. Such deprivation must be "under color of law." There must be state action. Adickes v. S. H. Kress & Co., 398 U.S. 144, 150, 152, n. 7, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Price, 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 16 L. Ed.2d 267 (1966). We find neither a constitutional deprivation nor state action.

Appellees have been strip mining the Watsons' land under authority of a "broad form" deed executed in 1905. The deed, which included a waiver of damages, severed the mineral rights from the surface estate thereby creating two distinct estates in the land by conveying the rights to:

"all coal minerals and mineral substances and products; all oils and gases; all salt and salt mineral waters; all fire and potters clay; all iron and iron ores; all stone; all slate; all ores and mines; and all subterranean substances and products; and all combinations of same, or any or all of the same; situated, lying and being in, on or under the hereinafter described land, or that may hereafter be found thereon, therein or thereunder; and such of the standing timber thereupon as may, at any time of the use thereof, be, or by the party of the second part, its successors or assigns, be deemed necessary or convenient for mining purposes, or so deemed necessary or convenient for the exercise and enjoyment of any or all the property, rights and privileges herein bargained, sold, granted or conveyed, including timber necessary for dams and railroads, or branch lines thereof, as may hereafter be constructed upon the said lands; and the exclusive rights-of-way for any and all railroads, tram roads, haul roads and other ways, pipe lines, telephone and telegraph lines that may hereafter be located on said land by the parties of the first part, their heirs, representatives or assigns, or by the party of the second part, its successors or assigns, or by any person or corporation with or without the authority of either of said parties, their, or its heirs, representatives, successors or assigns; and also the right to maintain, keep in repair and operate the same and said railroads, tram roads, haul roads, ways, pipe lines, telephone and telegraph lines; and also the exclusive right to enter upon said land and drill thereupon for oil and gas, and to pump for and store the same upon said land, and remove pipe and transport the same therefrom; and to use and operate the said land and surface thereof and any and all parts thereof, including the right to use, divert, dam and pollute water courses thereon in any and every manner that may, by party to the second part, its successors or assigns, be deemed necessary or convenient for the full and free exercise and enjoyment of any and all the property, rights and privileges hereby bargained, sold, granted or conveyed, including, but not limiting to, that of drilling, mining, pumping and therefrom removing or otherwise utilizing the said pipe, telegraph and telephone lines, rights-of-way, roads, ways, timber, coal, minerals, slate, oil, gas, salt water, clay, iron ore, mines,

stone and subterranean substances and products thereof, and any and all other property and rights hereby bargained, sold, granted or conveyed, and for the transportation therefrom of said articles; and also the right to build, erect, alter, repair, maintain and operate upon said land, and at its option to therefrom remove, any and all houses, shops, buildings, tanks, derricks, inclines, tipples, dams, coke-ovens, store and ware rooms, and machinery and mining and any and all equipment, that may, by party of the second part, its successors or assigns, be deemed necessary or convenient for the full and free exercise and enjoyment of any and all the property, rights and privileges hereby bargained, granted, sold or conveyed; and the right to thereupon convert, reduce, refine, store, dump and manufacture the said, or any or all of said property, or products, in, upon or under said land, or other land owned, or hereafter acquired by said party of the second part, its successors or assigns, by purchase, lease or otherwise; and the right to dump, store and leave upon said land any and all muck, bone, shale, water or other refuse from said mines, wells, ovens or houses; and any and all matters and products that may be excavated from mines or produced by the exercise or enjoyment of any or all the property, rights and privileges hereby bargained, sold, granted or conveyed; and the right to remove all pillars and other lateral and subjacent supports without leaving pillars to support the roof or surface; and the right to use said land for removal or storage of the products taken out of any other land owned, or hereafter acquired by party of the second part, its sucessors or assigns by lease or otherwise; and the right to erect upon said land and maintain, use, repair and operate, and at their pleasure remove therefrom, any and all buildings and structures, and machinery and mining and any and all

equipment, whether specifically enumerated herein or not, that may, by party of the second part, its successors or assigns, be deemed necessary or convenient for the exercise or enjoyment of any or all the property, rights and privileges herein bargained, sold, granted or conveyed; and also the free access to, upon and over said land for the purpose of surveying and prospecting for said property and interests."

■ The Court of Appeals of Kentucky has held that a "broad form" deed gives the mineral owner the right to strip mine and subjects him to liability only if he exercises that right wantonly, oppressively, maliciously or arbitrarily. *See, e. g.,* Martin v. Kentucky Oak Mining Co., 429 S.W.2d 395, 399 (Ky.1968); Croley v. Round Mountain Coal Co., 374 S.W.2d 852, 854 (Ky.1964); Blue Diamond Coal Co., Inc. v. Campbell, 371 S. W.2d 483, 485 (Ky.1963); Ritchie v. Midland Mining Co., 347 S.W.2d 548 (Ky.1961); Kodak Coal Co. v. Smith, 338 S.W.2d 699, 701 (Ky.1960); Blue Diamond Coal Co. v. Neace, 337 S.W.2d 725, 728 (Ky.1960); Bevander Coal Co. v. Matney, 320 S.W.2d 301, 302 (Ky. 1959); Buchanan v. Watson, 290 S.W.2d 40, 43 (Ky.1956).

The Watsons contend that this interpretation of the deed by the Kentucky Court of Appeals so as to authorize strip mining on their property has denied them due process and constitutes a taking without compensation because: 1) The Court retroactively has expanded and enlarged the mineral owner's rights under the deed; 2) the Court has given the coal miners a privileged position to the detriment of the surface owners; and 3) the deed does not specifically authorize strip mining, and, indeed, strip mining was not contemplated at the time the mineral rights were conveyed.

As support for their argument that the Court of Appeals of Kentucky unconstitutionally has enlarged the rights conveyed by a "broad form" deed, appellants rely on West Kentucky Coal Co. v.

Dilback, 219 Ky. 783, 784, 294 S.W. 478, 479 (1927), wherein the Court stated:

"As we have said, the right to mine is subservient to the right of the surface owners to have the surface maintained in its natural state free from subsidence or partings of the soil, and this right of support is absolute and not dependent upon any question of negligence."

We fail to see how this case, which recites the general rule, lends support to the argument of the Watson family. The Watsons have assumed that they had rights under the "broad form" deed which were subsequently destroyed by decisions of the Court of Appeals of Kentucky. This assumption completely sidesteps the threshold question in this case, that is, did the Watsons' predecessors in title give up the rights that the Watsons now complain have been taken from them. Thus, the success of the Watsons' case depends on whether they possess rights under the deed which they complain have been taken from them. Under the common law of Kentucky, the predecessors in title to the Watsons gave up the right to prevent the appellees from strip mining.

■■ The question of the rights and liabilities under a grant or deed is a question of state property law of which the federal courts can have no concern unless there is a violation of the Constitution or laws of the United States. American Railway Express Co. v. Kentucky, 273 U.S. 269, 47 S.Ct. 353, 71 L. Ed. 639 (1927); Tracy v. Ginzberg, 205 U.S. 170, 27 S.Ct. 461, 51 L.Ed. 755 (1907). *Accord* Evans v. Abney, 396 U. S. 435, 439, 443–444, 90 S.Ct. 628, 24 L. Ed.2d 634 (1970). Absent an actionable violation, it is not the role of the federal judiciary to act as a super-legislature by setting aside the property law of a state simply because we might consider the law to be unwise or harsh. To do so would constitute an abdication of the responsibility of federal judges "to construe and enforce the Constitution and laws of the land as they are and not to legislate social policy on the basis of our own personal inclinations." 396 U.S. at 447. See also North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973). As stated by Mr. Justice Harlan in *Tracy, supra*:

"The decision of a state court, involving nothing more than the ownership of property, with all parties in interest before it, cannot be regarded by the unsuccessful party as a deprivation of property without due process of law, simply because its effect is to deny his claim to own such property. If we were of opinion, upon this record, that the money received by Ginzberg from O'Hearn really belonged to Tracy,—upon which question we express no opinion,—still it could not be affirmed that the latter had, within the meaning of the Constitution, and by reason of the judgment below, been deprived of his property without due process of law. Under the opposite view every judgment of a state court, involving merely the ownership of property, could be brought here for review,—a result not to be thought of. The 14th Amendment did not impair the authority of the States, by their judicial tribunals, and according to their settled usages and established modes of procedure, to determine finally, for the parties before it, controverted questions as to the ownership of property, which did not involve any right secured by the Federal Constitution, or by any valid act of Congress, or by any treaty. Within the meaning of that Amendment, a deprivation of property without due process of law occurs when it results from the arbitrary exercise of power, inconsistent with 'those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country.'" 205 U.S. at 178.

These same principles were reaffirmed in *American Railway Express Co., supra,* wherein the Court stated:

"The Kentucky court had jurisdiction and has determined only that under common law principles, in the peculiar circumstances above narrated, where the facts were or might have been known to the purchasing corporation it became liable for claims against the vendor resulting from transactions within the state. The action of the court followed a fair hearing, and there is no pretense that the challenged views were adopted in order to evade a constitutional issue. We cannot interfere, unless the judgment amounts to mere arbitrary or capricious exercise of power, or is in clear conflict with those fundamental 'principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights.' Pennoyer v. Neff, 95 U.S. 714, 733 [24 L.Ed. 565]; Booth v. Illinois, 184 U.S. 425, 429 [22 S.Ct. 425, 46 L.Ed. 623]; Truax v. Corrigan, 257 U.S. 312, 329 [42 S.Ct. 124, 66 L.Ed. 254].

"It is firmly established that a merely erroneous decision given by a state court in the regular course of judicial proceedings does not deprive the unsuccessful party of property without due process of law. Arrowsmith v. Harmoning, 118 U.S. 194, 195 [6 S.Ct. 1023, 30 L.Ed. 243]; Iowa Central Ry. Co. v. Iowa, 160 U.S. 389, 393 [16 S.Ct. 344, 40 L.Ed. 467]; Tracy v. Ginzberg, 205 U.S. 170, 177 [27 S.Ct. 461, 51 L.Ed. 755]; Bonner v. Gorman, 213 U.S. 86, 91 [29 S.Ct. 483, 53 L.Ed. 709]; McDonald v. Oregon R. R. & Nav. Co., 233 U.S. 665, 669 [34 S.Ct. 772, 58 L.Ed. 1145]." 273 U.S. at 273.

More recently, in *Evans, supra,* the Supreme Court addressed itself to this question of federal interference with state law. *Evans* was a case where the Supreme Court of Georgia had terminated a trust that had established a park open only to whites. The intent of the testator had been specific in that only whites were allowed to use the park. The Georgia *cy pres* doctrine would not allow the Georgia courts to reform the trust, but rather would give effect to the desire of the testator to have the trust terminated instead of integrating the park. The Supreme Court affirmed, noting that there was no violation of any constitutionally protected rights because both whites and non-whites had been deprived of the use of the park. The effect of this decision, however, was to uphold state law that enforced clearly discriminatory provisions of a trust agreement. Justice Black, speaking for the Court, stated:

"We are of the opinion that in ruling as they did the Georgia courts did no more than apply well-settled general principles of Georgia law to determine the meaning and effect of a Georgia will. 396 U.S. at 439.

\*     \*     \*     \*     \*     \*

"Here, however, the action of the Georgia Supreme Court declaring the Baconsfield trust terminated presents no violation of constitutionally protected rights, and any harshness that may have resulted from the state court's decision can be attributed solely to its intention to effectuate as nearly as possible the explicit terms of Senator Bacon's will. 396 U.S. at 444.

\*     \*     \*     \*     \*     \*

"The construction of wills is essentially a state-law question, Lyeth v. Hoey, 305 U.S. 188 [59 S.Ct. 155, 83 L.Ed. 119] (1938), and in this case the Georgia Supreme Court, as we read its opinion, interpreted Senator Bacon's will as embodying a preference for termination of the park rather than its integration. Given this, the Georgia court had no alternative under its relevant trust laws, which are long standing and neutral with regard to race, but to end the Baconsfield trust and return the property to the Senator's heirs. *Id.*

\*     \*     \*     \*     \*     \*

"In the case at bar there is not the slightest indication that any of the Georgia judges involved were motivated by racial animus or discriminatory intent of any sort in construing and enforcing Senator Bacon's will. 396 U.S. at 445.

"What remains of petitioners' argument is the idea that the Georgia courts had a constitutional obligation in this case to resolve any doubt about the testator's intent in favor of preserving the trust. Thus stated, we see no merit in the argument. The only choice the Georgia courts either had or exercised in this regard was their judicial judgment in construing Bacon's will to determine his intent, and the Constitution imposes no requirement upon the Georgia courts to approach Bacon's will any differently than they would approach any will creating any charitable trust of any kind. Surely the Fourteenth Amendment is not violated where, as here, a state court operating in its judicial capacity fairly applies its normal principles of construction to determine the testator's true intent in establishing a charitable trust and then reaches a conclusion with regard to that intent which, because of the operation of neutral and nondiscriminatory state trust laws, effectively denies everyone, whites as well as Negroes, the benefits of the trust." 396 U.S. at 446.

We think the above quotations from *Evans, supra,* are equally applicable to the question presented in this case and reaffirm those principles set forth in *Tracy* and *American Railway Express Co., supra.* It is with these considerations in mind that we must examine the alleged constitutional deprivation asserted by the Watson family.

Apparently, it is contended that the Court of Appeals of Kentucky has an improper motive with respect to mining deeds. The Watsons, in effect, argue that the Court has given the coal mining industry a privileged position in derogation of the rights of surface owners. Reliance is placed upon Wiser Oil Co. v. Conley, 346 S.W.2d 718 (Ky.1960), wherein the Court refused to interpret an oil lease so as to authorize the surface destructive "water flooding" method of oil recovery to increase oil production. In that case the Court concluded that "it was the intention of the parties that oil be produced by drilling in the customary manner that prevailed when the lease was executed." 346 S.W.2d at 721–722. Appellants contend that the broad form deed should be interpreted so as to prohibit strip mining because it was not the customary manner of mining at the time the deed was executed. Indeed, it may not have been known at that time. By conclusory reasoning, the Watsons allege that but for the coal mining industries' privileged position, the deed would have been interpreted so as to exclude strip mining.

We do not find this argument to be persuasive. At least one distinction between *Wiser* and the strip mining cases is the deed itself. The broad form deed is a thorough denunciation of surface rights and, unlike *Wiser,* expressly includes a waiver of damages. Such a distinction, although the result may be considered to be harsh, does not show any improper motive on the part of the Court of Appeals of Kentucky.

Neither do we find that the Kentucky court was doing anything more than applying traditional concepts of deed construction that were neutral and of long standing. This is evidenced in Buchanan v. Watson, 290 S.W.2d 40 (Ky.1956), which was the first case significantly to interpret the broad form deed. The Court noted that the deed conveyed all of the coal in, on and under the land, did not contain any limitations or prohibitions on the method to be used to extract it, and contained an express waiver of damages. These considerations led the Court to conclude that the surface estate was subservient to the mineral estate. Applying the fundamental rule for deed construction that any ambiguity was to be construed most strongly against the grantor and in favor of the grantee, the Court held that

the deed authorized strip mining and would only allow damages if the right were exercised arbitrarily, wantonly or maliciously. *Id.* at 42–43.

The Watsons contend that a broad form deed could not authorize strip mining because "it is inconceivable that the surface owners would have authorized the destruction of their land." Additionally, much emphasis is placed upon the fact that, apparently, no other jurisdiction has interpreted a broad form deed so as to permit strip mining.

■  We do not find it helpful to the position of the Watsons that no other state court has interpreted a broad form deed to allow strip mining. Property law is, and must be, a creature of state law, with peculiar nuances in each jurisdiction. The rule in these strip mining cases evolved through custom and usage that were peculiar to Kentucky law and history. It is only when these rules are arbitrary or capricious or in clear conflict with fundamental principles of jurisprudence that a federal court may act. *American Railway Express Co., supra,* 273 U.S. at 273; *Tracy, supra,* 205 U.S. at 178. We are unwilling so to characterize the decisions of the Court of Appeals of Kentucky.

The recent case of Martin v. Kentucky Oak Mining Co., 429 S.W.2d 395 (1968), shows the great extent to which the Court of Appeals of Kentucky has relied on historical data to interpret a broad form deed and fathom the intent of the parties. The deed in *Martin* was also executed in 1905 and dealt with land in Knott County, a county contiguous with Magoffin. The Court stated: "Of course in endeavoring to find the intent of the parties we must consider the situation and circumstances existing when the deeds were made." 429 S.W.2d at 397.

This court, in Peabody Coal Co. v. Pasco, 452 F.2d 1126, 1132 (6th Cir. 1971), said with reference to the decision of the Kentucky Court in *Martin:*

"The court then considered some of the circumstances attending the execution of the 'broad form' deed involved. It was noted that in 1900 only 17 per cent of the land in Knott County, where the subject property was located, was improved agricultural land. Much of the *Martin* tract was hillside land and of no productive value. The court weighed these facts against the argument that no farmer would intend that his *fields* be destroyed by mining operations. Also considered was the fact that in 1900 the average value per acre of land in Knott County was $2.90 while in 1905 only the minerals rights to the *Martin* tract were purchased for $3.00 per acre. The court apparently considered the evidence that the full value of the land had been paid to the grantor in evaluating the possibility that the original grantor in fact intended to convey the complete use of the surface and to retain bare title for whatever value it may have. Another circumstance mentioned was the fact that even in 1905 there were potential sources of damage to the land from customary deep mining methods. A final consideration examined by the court was that under a 'broad form' deed the surface owner reserved use of the land for agricultural purposes only to the extent that such use was consistent with the rights of the mineral owner. The court considered this factor as evidence that agricultural values were subordinated to mineral values. After considering the particular circumstances surrounding the execution of the *Martin* deed and the particular language of that deed the court held that 'the mineral owner bought and paid for the right to destroy the surface in a good faith exercise of the right to remove the minerals.' 429 S. W.2d at 399."

■  We hold that the Court of Appeals of Kentucky did nothing more than apply well settled general principles of

Kentucky law to interpret a Kentucky deed. This law is neutral and there is not the slightest indication that the Court was motivated by any improper motive or that broad form deeds were treated in a manner different from other deeds. Nor has the Court of Appeals of Kentucky exercised its power arbitrarily or capriciously or in a manner that would offend fundamental principles of jurisprudence.

◼ The second prerequisite for federal jurisdiction is that the alleged deprivation be committed under color of law. The Watsons contend that Kentucky's environmental laws and regulations are sufficient to constitute the necessary degree of state involvement. In the alternative, they argue that the decisions of the Court of Appeals of Kentucky interpreting the broad form deed in unrelated cases are state action.

Kentucky has regulated extensively the environmental aspects of strip mining. Kentucky Revised Statutes, Ch. 350. The Department of Environmental Protection and its Division of Reclamation are charged with the responsibility of enforcing these laws. K.R.S. 350.020. The purpose of these laws is best shown in the "Declaration of legislative policy and finding of fact," K.R.S. 350.020, which states:

"The general assembly finds that the unregulated strip mining of coal causes soil erosion, damage from rolling stones and overburden, landslides, stream pollution, the accumulation of stagnant water and the seepage of contaminated water, increases the likelihood of floods, destroys the value of land for agricultural purposes, destroys asthetic values, counteracts efforts for the conservation of soil, water and other natural resources, destroys or impairs the property rights of citizens, creates fire hazards, and in general creates hazards dangerous to life and property, so as to constitute an imminent and inordinate peril to the welfare of the commonwealth. The general assembly further finds that lands that have been subjected to

strip mining and have not been reclaimed and rehabilitated in accordance with modern standards constitute the aforementioned perils to the welfare of the commonwealth. The general assembly further finds that there are wide variations in the circumstances and conditions surrounding and arising out of the strip mining of coal due primarily to difference in topographical and geological conditions, and by reason thereof it is necessary, in order to provide the most effective, beneficial and equitable solution to the problem, that a broad discretion be vested in the authority designated to administer and enforce the regulatory provisions enacted by the general assembly. Therefore, it is the purpose of this chapter to provide such regulation and control of the strip mining of coal as to minimize or prevent its injurious effects on the people and resources of the commonwealth. To that end, the division and the department are directed to rigidly enforce this chapter and to adopt whatever regulations are found necessary to accomplish the purpose of this chapter."

Pursuant to statutory authorization, K.R.S. § 350.060, strip miners are required to obtain permits to mine. In order to obtain a permit, the miners are required to submit, *inter alia,* plans or proposals showing the method of operation, the manner, time and distance for backfilling, grading work and a reclamation plan for the affected area. These plans must meet the minimum requirements of the laws and regulations. Moreover, Chapter 350 provides a full spectrum of mechanisms so as to insure compliance with its provisions.

Apparently conceding that the state action cannot, in this case, be premised on a partnership, governmental function or entwinement theory, the Watson family seeks to rely on an "encouragement" theory and contends that the state's issuance of permits to strip mine is sufficient state action to support federal jurisdiction. Principal reliance is placed

on Moose Lodge No. 107 v. Irvis, 407 U. S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). The Watsons contend that when state regulations are aimed directly at the harm complained of, and not peripheral aspects, there is significant state action. Thus, it is argued that the strip mining regulations are directed at the destructive aspects of strip mining and have the effect of encouraging and approving these practices. We find this argument to be without merit.

■ *Moose Lodge, supra,* was a case wherein the policy of a private club was to discriminate against blacks. The plaintiff in that case had alleged that such discrimination was under color of state law because the state of Pennsylvania licensed Moose Lodge to serve liquor. After reviewing the concept of "state action" and admitting that it "frequently admits of no easy answer," the Court went on to analyze the degree of involvement of Pennsylvania with the Moose Lodge. 407 U.S. at 172, 175–177. The Court noted that Moose Lodge was a private club situated on private property and was not publicly funded. *Id.* at 171. The state licensing board could require the club to make physical alterations, required the club to file a list of the names and addresses of its members and employees and also required the keeping of extensive financial records. Finally, the board was granted the right to inspect the premises. *Id.* at 176. With this pervasive scheme of regulations, the Supreme Court found no state action because the regulations, regardless of how detailed they might be, did not in any way foster or encourage discrimination, nor was the state a partner or joint venturer in the enterprise. *Id.* at 176–177. Certain regulations, however, were found to constitute state action because they required the club to adhere to discriminatory provisions in its constitution and bylaws. The distinction that emerges from the case is that where regulations give impetus to private conduct so as to foster or encourage it, state action will arise.

Similarly, in *Pollak, supra,* the Public Utilities Commission of the District of Columbia approved the practice of piping radio service into buses that were regulated by the commission. Plaintiffs complained that the piping of radio service into the buses violated their constitutional rights. Relying particularly on the fact that the Commission approved of the practice, the Supreme Court found a sufficiently close relationship between the federal government and the radio service to make it necessary to consider the alleged constitutional deprivation. 343 U.S. at 462.

We conclude that these cases do not support the contention of the Watson family. The alleged wrong in this case is that the appellees have been permitted to strip mine the Watsons' land. The right to strip mine and the waiver of damages do not originate with the state licensing authority. They have their origin in the "broad form" deed. Thus, Kentucky's environmentally oriented laws and regulations are not aimed at the alleged wrong. Nor do they encourage strip mining. The effect of these laws and regulations is to narrow and restrict appellees' rights under the deed, and, thus, inure to the benefit of the land owner.

The instant case is also readily distinguishable from our decision in Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d 153 (6th Cir. 1973). In *Palmer*, the defendant was a utility company to which the state granted powers not usually possessed by private corporations. Additionally, the operations of the company were circumscribed fully by an all encompassing system of regulations and statutes, both state, local and administrative. Virtually every one of the company's activities, including the specific activity complained of, were regulated. In view of these factors, we held that the state had injected itself into a position of interdependence with the company so that it was a joint participant. *Id.* at 165. On the contrary, the state in

the present case has not even approached joint participation with the coal companies.

We do not find a sufficiently close relationship between the alleged wrong in this case and Kentucky's environmental laws. Accordingly, we hold that the issuance of a permit to strip mine to a private coal company for the purpose of enforcing that state's environmental policy is not such state action as would support a claim under 42 U.S.C. § 1983.

In the alternative, appellants argue that the line of Kentucky decisions interpreting a broad form deed so as to authorize strip mining is state action.

■ Since the decision in Shelley v. Kraemer, 334 U.S. 1, 14–18, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), it has been established that a state's judicial proceedings can be a form of actionable state action. *See also* New York Times Co. v. Sullivan, 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (First Amendment deprivation). This principle has been recognized explicitly in recent Supreme Court decisions. *See, e. g., Moose Lodge, supra,* 407 U.S. at 179.

The distinguishing feature of all of these state action cases, however, is the fact that the aggrieved party was a party to the state court proceedings. In this case, the Watsons were never a party to any state court proceedings wherein the interpretation of their broad form deed was at issue. They have proceeded upon the theory that it would have been futile to litigate the deed in the Kentucky courts because "in case after case the Kentucky Court has upheld the right of the mineral estate owner to engage in strip mining." We have found no case that even intimates that state action can be premised on a state's common law as applied to different parties and different issues. Were we to accept appellants' argument, we would be, in effect, predicting the outcome in a case where the intent of the parties governed. It may be possible that the factors considered by the Court in *Martin, supra,* 429 S.W.2d at 397–398, which were critical

to that decision are not present in this case. We decline to second guess the Court of Appeals of Kentucky.

We think the case at bar is analogous to the recent line of pre-judgment, self help remedy cases. *See, e. g.,* Bond v. Dentzer, 494 F.2d 302 (2nd Cir. 1974) (self help attachment of wages); Adams v. Southern California First National Bank, 492 F.2d 324 (9th Cir. 1974) (self help repossession of car); Bichel Optical Laboratories, Inc. v. Marquette Nat. Bank of Minneapolis, 487 F.2d 906 (8th Cir. 1973) (self help seizure of funds). In each of these cases the seizure of property involved only private actions arising out of written agreements between the parties. The actions were, however, authorized under state law. The courts refused to find state action based on the mere passage of laws by state legislatures authorizing the agreements. In none of these cases were the parties involved in judicial proceedings. Analogously, in the case at bar the right to strip mine and the waiver of damages are derived from a private agreement, and the Watsons have not been a party to any state proceedings.

■ We decline to expand the state action concept to embrace a line of state court decisions in transactions unrelated to the one at bar.

We are cognizant of the environmental problems associated with strip mining and are sympathetic with the plight of the Watson family. However, this court is not a super legislature and has no power to act in the absence of jurisdiction. The remedy lies with the legislature and the courts of Kentucky. Two justices of the Court of Appeals of Kentucky have expressed strong views to the effect that the decisions of that court construing the 1905 broad form deed should be overruled. See dissenting opinion of Mr. Justice Edward P. Hill, concurred in by Mr. Justice James B. Milliken, in Martin v. Kentucky Oak Mining Co., *supra,* 429 S.W.2d at 400.

Affirmed.