No. 74–294. WATSON ET AL. *v.* KENLICK COAL Co., INC., ET AL. C. A. 6th Cir. Certiorari denied. Reported below: 498 F. 2d 1183.

MR. JUSTICE DOUGLAS, dissenting.

Petitioners are landowners in Magoffin County, Ky. Seventy years ago, their predecessors in ownership deeded away all rights to the minerals in and under their land, retaining only the surface rights; respondents are the present holders of the mineral rights, and have strip-mined much of the coal which underlies the land. Petitioners brought this action under 42 U. S. C. § 1983, seeking injunctive relief [1] and damages for the destruction of the land surface through respondents' strip-

---

[1] The prayer for injunctive relief is now mooted, for all practical purposes, by the recent revision of Ky. Rev. Stat. Ann. § 350.060. See Ky. Acts 1974, c. 373, p. 719. Effective January 1, 1975, that statute prohibits strip mining without the written consent of the owner of any freehold interest in the surface land. This statutory change clearly would not moot petitioners' claim for damages based upon respondents' past conduct.

mining operations. The Court of Appeals affirmed the dismissal of the complaint, holding that there was no state action involved and that petitioners had not been deprived of any federal constitutional right. 498 F. 2d 1183 (CA6 1974).

This case is unfortunately no more than a mere footnote in a continuing tragedy of environmental and human despoliation. The rape of Appalachia for its precious coal has been a dark and dismal chapter in our Nation's history, moving one observer to lament:

> "Coal has always cursed the land in which it lies. When men begin to wrest it from the earth it leaves a legacy of foul streams, hideous slag heaps and polluted air. It peoples this transformed land with blind and crippled men and with widows and orphans. It is an extractive industry which takes all away and restores nothing. It mars but never beautifies. It corrupts but never purifies." [2]

One of the hardest hit areas has been the Cumberland Plateau in eastern Kentucky. In the late 19th century, the hill country was swept by a virtual wave of coal buyers seeking to acquire precious mineral rights from the often naive and illiterate mountaineers. The contest was hardly an equal one,[3] and most coal buyers

---

[2] H. Caudill, Night Comes to the Cumberlands x (1963).

[3] Harry Caudill, a Kentucky attorney with a long history of involvement in strip-mining litigation, has painted a vivid picture of these encounters:

"In the summer of 1885 gentlemen arrived in the county-seat towns for the purpose of buying tracts of minerals, leaving the surface of the land in the ownership of the mountaineers who resided on it. The Eastern and Northern capitalists selected for this mission men of great guile and charm. They were courteous, pleasant and wonderful storytellers. Their goal was to buy the minerals on a grand scale as cheaply as possible and on terms so favorable to the purchasers as to grant them every desirable exploitive privilege,

escaped with a stack of "broad-form" deeds which left nominal title to the land surface in the landowner, but which conveyed to the grantee the right to excavate and remove all minerals and, in the course of such removal, to divert and pollute the water and to dump mining refuse on the surface. Against the backdrop of then-current mining technology, the prospects and hazards of such actions must have seemed remote and insignificant.[4]

while simultaneously leaving to the mountaineer an illusion of ownership and the continuing responsibility for practically all the taxes which might be thereafter levied against the land.

. . . . .

"When the highland couple sat down at the kitchen table to sign the deed their guest had brought to them they were at an astounding disadvantage. On one side of the rude table sat an astute trader, more often than not a graduate of a fine college and a man experienced in the larger business world. He was thoroughly aware of the implications of the transaction and of the immense wealth which he was in the process of acquiring. Across the table on a puncheon bench sat a man and woman out of a different age. Still remarkably close to the frontier of a century before, neither of them possessed more than the rudiments of an education. Hardly more than 25 per cent of such mineral deeds were signed by grantors who could so much as scrawl their names. Most of them 'touched the pen and made their mark,' in the form of a spidery X, in the presence of witnesses whom the agent had thoughtfully brought along. Usually the agent was the notary public, but sometimes he brought one from the county seat. Unable to read the instrument or able to read it only with much uncertainty, the sellers relied upon the agent for an explanation of its contents—contents which were to prove deadly to the welfare of generations of the mountaineer's descendants." *Id.*, at 72–74.

[4] See *Martin* v. *Kentucky Oak Mining Co.*, 429 S. W. 2d 395, 401 (Ky. 1968) (Hill, J., dissenting):

"Strip mining was neither heard of nor dreamed of in 1905 in Knott County, the locality of the coal land in question. There was no railroad in Knott County until long thereafter. Neither was there a navigable stream in that county. About the only coal mined in those days was from the outcroppings in creek beds, where a small

With the advance of technology, however, the stakes increased; each successive innovation was visited upon the mountaineers with the approval of the courts, which found these new and unforeseen techniques to fall within the scope of the aged and yellowing deeds. Judicial decisions gave virtually untrammeled powers to the coal companies, so long as they acted without malice:

> "With impunity [the companies] could kill the fish in the streams, render the water in the farmer's well unpotable and, by corrupting the stream from which his livestock drank, compel him to get rid of his milk cows and other beasts. They were authorized to pile mining refuse wherever they desired, even if the chosen sites destroyed the homes of farmers and bestowed no substantial advantage on the corporations. The companies which held 'long-form' mineral deeds were empowered to withdraw subjacent supports, thereby causing the surface to subside and fracture. They could build roads wherever they desired, even through lawns and fertile vegetable gardens. They could sluice poisonous water from the pits onto crop lands. With im-

quantity was obtained by the use of a newfound tool—the coal pick."

A similar description appears in H. Caudill, *supra,* n. 2, at 305–306:

"[W]hen the mountaineer's ancestor (for the seller is, in most instances, long since dead) sold his land he lived in an isolated backwater. Coal mining was a primitive industry whose methods had changed little in a hundred years and which still depended entirely on picks and shovels. To the mountaineer 'mining' meant tunneling into a hillside and digging the coal for removal through the opening thus made. That the right to mine could authorize shaving off and destroying the surface of the land in order to arrive at the underlying minerals was undreamed of by buyers and sellers alike."

punity they could hurl out from their washeries clouds of coal grit which settled on fields of corn, alfalfa and clover and rendered them worthless as fodder. Fumes from burning slate dumps peeled paint from houses, but the companies were absolved from damages.

". . . The companies, which had bought their coal rights at prices ranging from fifty cents to a few dollars per acre, were, in effect, left free to do as they saw fit, restrained only by the shallow consciences of their officials." [5]

The final blow in the expansion of the coal companies' rights under broad-form deeds was struck when the Kentucky Court of Appeals, in *Buchanan* v. *Watson*, 290 S. W. 2d 40 (1956), held that the broad-form deed conveys the right to strip-mine and that the mining company, in the absence of arbitrary, wanton, or malicious destruction, incurs no liability to the surface owner for destruction of the surface during the strip-mining process. The Kentucky court has adhered to that holding through an unbroken string of decisions culminating in *Martin* v. *Kentucky Oak Mining Co.*, 429 S. W. 2d 395 (1968), where the court reaffirmed *Buchanan* over the vigorous dissent of three of its members.[6] While the Kentucky General Assembly has finally provided legislative relief for the victims of strip mining,[7] that

---

[5] H. Caudill, *supra*, n. 2, at 306–307.

[6] Judge Hill, joined in his dissenting opinion by Judge Milliken, stated: "I am shocked and appalled that the court of last resort in the beautiful state of Kentucky would ignore the logic and reasoning of the great majority of other states and lend its approval and encouragement to the diabolical devastation and destruction of a large part of the surface of this fair state without compensation to the owners thereof." 429 S. W. 2d, at 402.

[7] See n. 1, *supra*.

relief is prospective only and will not bring about the repair or reclamation of already ravaged lands.

In my view, the courts below took an unjustifiably narrow approach to the state-action issue presented by this lawsuit. It is undisputed that Kentucky imposes extensive regulatory controls upon strip miners, including a permit requirement and a requirement that plans meeting minimum legal standards be submitted.[8] This regulatory involvement alone might not be sufficient to warrant a finding of state action, but it is coupled with a long and unbroken line of state-court decisions recognizing and enforcing strip-mining rights under broad-form deeds. It is well settled that state judicial decrees, as well as legislative enactments, may constitute state action.[9] See *Shelley* v. *Kraemer,* 334 U. S. 1 (1948).

It is said that respondents are simply private parties engaged in the exercise of private contractual rights conferred upon them by petitioners' predecessors in interest; but the very claim raised by petitioners is that those private contractual rights have been arbitrarily and irrationally broadened by the state courts to a degree never contemplated by the grantors.[10] The State's role

---

[8] Ky. Rev. Stat. Ann. §§ 350.060 (1)–(6), as amended by Ky. Acts 1974, c. 69, p. 64, c. 258, p. 491, and c. 273, p. 719.

[9] It is true that this particular deed has not been the subject of any state court proceeding, and that petitioners thus have not experienced the direct application of an adverse ruling by the state courts. Nevertheless, the Kentucky Court of Appeals has been unswerving in its adherence to the *Buchanan* rule, and there is no reason to suppose that petitioners' deed would receive a more favorable interpretation.

[10] It is interesting to note that Kentucky courts stand virtually alone in the degree to which they have expanded grantees' rights under broad-form deeds. Contrary decisions from sister States are collected in *Martin* v. *Kentucky Oak Mining Co.,* 429 S. W. 2d, at 402 (Hill, J., dissenting).

in this process can hardly be termed that of an innocent and disinterested bystander—respondents, in exercising their claimed rights under the broad-form deed, are clearly armed with the weight and force of state judicial precedent, and the enforcement power of the State lurks in the background as guarantor of those rights.

In light of the above, petitioners' claim of state action is not insubstantial on the facts of this case. Cf. *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 359 (1974) (DOUGLAS, J., dissenting); *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144 (1970); *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961).

Even if petitioners can establish the presence of state action, they cannot prevail unless they can also establish a deprivation of a federal constitutional right. The Court of Appeals properly recognized that the interpretation and delineation of contractual and property rights is ordinarily a matter of state law, pure and simple, and that an adverse interpretation by a state court, even if erroneous, does not constitute a deprivation of property without due process of law. On the other hand, the Due Process Clause of the Fourteenth Amendment is not wholly without content for purposes of evaluating the arbitrariness of actions by the State; state enactments and regulations may be tested under that Clause against a modest but identifiable standard of minimum rationality. See *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 490–491 (1955); cf. *Roe* v. *Wade*, 410 U. S. 113 (1973).

Petitioners argue that the state courts have interpreted broad-form deeds as conveying far more than those deeds could ever have been intended to convey, and that the result has been a taking of their property without due process. As *Williamson* makes clear, the standard of review under the Due Process Clause is a very minimal one, at least where no fundamental right or interest is

involved; the odds against the success of this type of due process argument are high, but I am not prepared to say that it could not succeed under any set of circumstances, no matter how extreme or outrageous.

If a petitioner came to us claiming that he had entered into a written contract for sale of his car, and that the state courts, in an action upon the contract, had interpreted the term "car" to include not only his automobile but his house, dog, and vegetable garden as well, I would hesitate to characterize as wholly frivolous his claim that he had been deprived of property without due process of law. The relevance of this example to the instant case would depend, of course, on the amount of evidence which could be adduced bearing upon the intent of petitioners' predecessors in interest, including any evidence of the relationship between the purchase price paid for the mineral rights alone and the full market value of the land and minerals together.[11] Petitioners face serious obstacles of proof in making a claim of this sort, but such obstacles cannot justify throwing them out of court at the pleading stage.

In my view, the issues presented by this petition are substantial. In some of our Western States, corporations which operate copper smelters have acquired from downwind farmers releases of claims for damages which are now recorded as the acquisition of "smoke easements." Thus the problem presented here may have wide application and deserves explication and decision by this Court. I would grant certiorari and set the case for oral argument.

---

[11] The record in the instant case apparently does not disclose any information about Magoffin County land values in relation to the purchase price per acre for the mineral rights under the deed in question, but such information could undoubtedly be produced on remand.