LeRoy MARTIN et al., Appellants,

v.

KENTUCKY OAK MINING COMPANY et al., Appellees.

Court of Appeals of Kentucky.

June 21, 1968.

Harry M. Caudill, Whitesburg, Courtney C. Wells, Hazard, for appellants.

J. W. Craft, Jr., Bruce Stephens, Jr., Hazard, Nathan Elliott, Jr., Lexington, James W. Haley, Washington, D. C., for appellees and cross-appellants.

David A. Schneider, Asst. Atty. Gen., Frankfort, for Commonwealth of Kentucky.

Edward M. Post, Louisville, for Kentucky Civil Liberties Union.

James Young, Hazard, for Appalachian Group to Save the Land and People, Inc.

F. Selby Hurst, Hurst & Burnett, Lexington, for Big Sandy-Elkhorn Coal Operators Ass'n.

Prewitt & Prewitt, Allen Prewitt, Sr., Frankfort, for Kentucky Members of the National Council of Coal Lessors, Inc.

Lawrence S. Grauman, Louisville, for Sierra Club.

CULLEN, Commissioner.

Under standard "broad form" mineral deeds of the character commonly employed in the Appalachian region in the early 1900's in the acquisition of mineral rights, the Kentucky River Coal Corporation owns the coal rights in a large acreage in eastern Kentucky. Coal mining operations on various of its lands are carried on, under leases, by Kentucky Oak Mining Company, Oak Branch Mining Company, Midland Mining Company and North Fork Coal Company.

LeRoy Martin and his wife own a 10-acre parcel of land in Knott County which in former ownership was part of a larger, 90-acre tract. Most of the parcel is hillside land but there is a small area of bottom land which is occupied by the Martins' dwelling house, outbuildings, and garden. In 1905 the mineral rights under the entire 90-acre tract were conveyed by the then owners to the predecessor in title of the Kentucky River Coal Corporation, under a "broad form" deed.

In September 1965 the Martins, alleging that the Kentucky River Coal Corporation and its lessee-operators were proposing the commencement of strip or auger mining operations on the Martins' land, brought the instant action seeking a declaration that under the mineral deed the owner of the minerals had no right to remove the coal by strip or auger mining. The coal companies answered asserting that they did have such right, and setting forth various other defenses. Ultimately, judgment was entered declaring that the mineral owner has the right to remove the coal by strip or auger mining but must pay damages to the surface owner for any *destruction* of the surface.

The Martins have appealed, maintaining that the judgment is erroneous in holding that the right to use strip or auger methods exists, and Kentucky River Coal Corporation, Kentucky Oak Mining Company and Oak Branch Mining Company have cross-appealed, contending that the judgment is in error in imposing upon the mineral owner the obligation to pay damages.

This is not a new problem. In Buchanan v. Watson, Ky., 290 S.W.2d 40, this court held squarely that under the broad form deed coal may be removed by strip mining without any obligation to pay damages except for those caused by oppressive, arbitrary, wanton or malicious action. (Ten years before Buchanan, in Treadway v. Wilson, 301 Ky. 702, 192 S.W.2d 949, the court in effect held that strip mining can be done under the broad form deed so long as it is not done "oppressively".) This ruling was adhered to, and extended to include auger mining, in Bevander Coal Co. v. Matney, Ky., 320 S.W.2d 301; Blue Diamond Coal Co. v. Neace, Ky., 337 S.W.2d 725; Kodak Coal Co. v. Smith, Ky., 338 S.W.2d 699; Ritchie v. Midland Mining Co., Ky., 347 S.W.2d 548; Wright v. Bethlehem Minerals Co., Ky., 368 S.W.2d 179; Blue Dia-

mond Coal Co. v. Campbell, Ky., 371 S.W.2d 483; and Croley v. Round Mountain Coal Co., Ky., 374 S.W.2d 852. So the issue in the instant case is simply whether the court shall stay with Buchanan v. Watson and the subsequent cases based upon it. (Other issues are raised in the briefs, as to whether there is in fact an actual controversy, whether there is a defect of parties, and whether the Attorney General properly was permitted to intervene in the lower court, but we do not consider it necessary to pass upon them because our decision on the merits of the main issue will render the other issues moot.)

The court has been favored with briefs amicus curiae on behalf of the Kentucky Civil Liberties Union, the Commonwealth, The Appalachian Group to Save the Land and People, Inc., the Kentucky Members of the National Council of Coals Lessors, Inc., the Sierra Club, and the Big Sandy-Elkhorn Coal Operators Association. The briefs have been most helpful and have presented ably and forcefully (as have those of the parties) the arguments pro and con.

The court is fully aware of the great public concern with the conservation problems attendant upon strip and auger mining, and the urgent necessity to protect the soil and the water courses from destruction and pollution. However, counsel for the landowners, and for those amicus curiae who side with them in arguing that the broad form deed does not permit strip or auger mining, frankly concede that a decision of this court upholding their contention as to the construction of the deed will not stop strip or auger mining. They admit that in Pennsylvania and West Virginia, where the courts have held that the broad form deed does not authorize strip or auger mining, that type of mining is even more prevalent than in eastern Kentucky. And of course it is common knowledge that strip mining has been done on a large scale in western Kentucky where the broad form deed was not commonly used.

So conservation is not in issue. The issue is whether the owners of minerals, who clearly have the right to remove the coal by deep mining processes, must purchase from the landowner the right to use strip or auger processes.

The arguments by the landowners and their adherents are that (1) the parties to the mineral deeds could not reasonably have intended that the surface could be "destroyed" in the removal of the minerals, because there would have been no point in the landowners' retaining surface title if it could be rendered worthless by the mineral owner; (2) it is unfair, unjust and inequitable to construe the deeds to allow "destruction" of the surface; (3) the parties to the deeds did not contemplate the development of strip and auger mining; (4) the word "mining" in the deeds embraces only mining by underground workings; (5) the right to "use" the surface granted to the mineral owner does not include the right to "destroy"; (6) the mineral owners should be estopped from strip or auger mining any area upon which they have permitted the surface owner to make improvements.

We think the first five arguments can be refined into one basic argument, that the broad form deed does not mean, and could not reasonably have been intended to mean, when it grants to the mineral grantee the right to use the surface of the land "as may be necessary or convenient to the exercise and enjoyment of the property rights and privileges hereby * * * conveyed," that the use, regardless of old or new methods, could be such as to destroy the value of the surface for agricultural or residential purposes. Whether or not the parties actually contemplated or envisioned strip or auger mining is not important—the question is whether they intended that the mineral owner's rights to use the surface in removal of the minerals would be superior to any competing right of the surface owner.

 Of course in endeavoring to find the intent of the parties we must consider the situation and circumstances existing when the deeds were made. Of significance, we think, are the following circum-

stances which relate particularly to the execution of the deed here in issue but which are typical of the circumstances attending the execution of a great many of the broad form deeds. In 1900 only 17 percent of the land in Knott County was *improved* agricultural land. A great percentage of the land (as was the case with the 90-acre tract of which the Martin parcel was a part) was *hillside* land of no productive value. The average value per acre of land in Knott County (in 1900) was only *$2.90 per acre*. The predecessors in title to the Martin land were paid *$3.00* per acre in 1905 for the mineral rights only.

So the argument that no *farmer* reasonably would have intended that his *fields* be destroyed by mining operations must be weighed in the light of the fact that there were very few farmers and very few fields involved in the mineral deed transactions. It is of course true that in a number of instances (as in the case before us) there was some bottom land embraced in the deed, and it reasonably can be argued that the owner would not have intended that his bottom land be destroyed. But on the other hand it can just as reasonably be argued that in order to obtain the best price for the mineral rights in his hillside land the owner had to throw in the rights in the bottom land also, and he was willing to take the chance on future destruction of his bottom land to get the immediate money. Otherwise, why did not the landowners simply exclude their bottom land from the deeds?

Certainly there were various sources of potential destruction of bottom land, in 1905, even from customary deep mining methods. Slag and waste could have been piled on the land; tram roads requiring land fills could have been built and slides could have been caused (see Wells v. North East Coal Co., 255 Ky. 63, 72 S.W.2d 745); springs could have been filled with dirt and muck, stones and other debris could have been deposited so as to destroy the land for agricultural purposes (see United Carbon Co. v. Webb, 282 Ky. 79, 137 S.W.2d 733); tipples and mine houses could have been built. Under the deeds, use of the land by the surface owner for agricultural purposes was reserved only so far as was consistent with the rights and privileges of the mineral grantee; in other words, agricultural values were specifically subordinated to mineral values.

The argument that the landowners would not have undertaken to *sever* the mineral title from the surface title, and retain the latter, instead of simply deeding the whole title to the mineral buyers, if they had not contemplated that the surface would retain its value for agricultural and residential uses, is not fully persuasive. We think the fact that in many instances, as here, the landowner was being paid, for the mineral rights alone, practically the full value of his land, might well indicate that the landowner chose to retain the *bare* title simply for what little value, if any, it might have.

If, as appears well may have been the case, the landowners who executed the broad form mineral deeds at the turn of the century were paid prices which substantially or in large part equaled the full value of the land (at least of the hillside land) we see nothing unfair, unjust or inequitable in construing the deeds in favor of the grantees. Certainly the fact that the surface of the land is worth much more today than it was in 1905 is not a valid reason for saying that the landowners should be paid again.

As concerns the matter of estoppel, we find no basis for an estoppel in the fact that an owner of thousands of acres of mineral rights does not advise a surface owner who is commencing to make improvements that the latter's rights are subordinate by law to those of the mineral owner, and that some day the mineral owner may reach that land in his mining operations. If there were any estoppel in this case it would be against the Martins, in that they built their improvements after Buchanan v. Watson had been decided, advising the public that strip mining could be done under the broad form deed.

We do not mean to discredit the arguments on behalf of the landowners. They have elements of merit and a degree of persuasiveness. However, they do not have the overwhelming force necessary to prevail against the long entrenched rule of our previous cases in reliance upon which property rights have vested. See Blue Diamond Coal Company v. Neace, Ky., 337 S.W.2d 725.

It is suggested that the court in Wiser Oil Company v. Conley, Ky., 346 S.W.2d 718, did depart from the principles of Buchanan v. Watson, in respect to oil rights, and that there is no reason why a similar departure could not be made with respect to coal rights. On its face *Wiser* purports to be consistent with *Buchanan*, because the opinion in *Wiser* undertakes to distinguish *Buchanan* on the ground that in the broad form mineral deeds there is a waiver-of-damage clause. However, in Croley v. Round Mountain Coal Co., Ky., 374 S.W.2d 852, the court said that the waiver-of-damage clause was not a controlling factor in the *Buchanan* decision. Perhaps *Wiser* is distinguishable from *Buchanan* on some basis other than that stated in the opinion in *Wiser*, or perhaps it is a departure from *Buchanan*. In any event we do not feel compelled in this opinion to explain, justify, reconcile or distinguish *Wiser*. The court has decided to adhere to *Buchanan* whether or not it conflicts with *Wiser*.

■ There remains for consideration the cross-appeal attacking that portion of the judgment which requires the mineral owner to pay damages for destruction of the surface caused by legitimate strip or auger mining operations. The appellants, as cross-appellees, do not undertake with any enthusiasm to argue that this portion of the judgment is correct. It appears to us that if, as we in substance are holding, the mineral owner bought and paid for the right to destroy the surface in a good faith exercise of the right to remove the minerals, then there is no basis upon which there could rest an obligation to pay damages for exercising that right. Certainly it could not rest upon any tort principle, and the only other possible basis—a *contractual* one—does not exist in the terms of the deed. So in our opinion the judgment is erroneous in declaring the obligation to pay damages (except of course for arbitrary, wanton or malicious acts).

On the direct appeal the judgment is affirmed; on the cross-appeal the judgment is reversed with directions to enter judgment in conformity with this opinion.

WILLIAMS, C. J., and MONTGOMERY, PALMORE and STEINFELD, JJ., concur.

HILL and MILLIKEN, JJ., jointly dissent.

OSBORNE, J., separately dissents.

OSBORNE, Judge (dissenting).

In my opinion the court should dismiss this action without reaching the merits because the parties have failed to show that there exists between them an actual controversy which will give right to a proceeding under KRS 418.005, etc., the Declaratory Judgments Act. The question here presented by the plaintiffs whose predecessors in title have executed a mineral lease is what law will be applicable and what will be the rights of the parties concerned if and when the holders of the mineral lease determine to excavate for minerals.[1]

Before relief will be granted in an action of this nature "the interest of the parties arising out of their relationship to each other and to the subject matter of the controversy must be more than merely general. It must be a substantial, direct and

---

1. It was testified for the officers of the corporation holding the mineral lease that they had no present plans to excavate at this time and they furthermore had serious doubts as to whether coal existed upon the property in such form that it would be expedient or economical to strip.

legally protectable *present* interest in the relief sought." (Emphasis added.) 22 Am. Jur.2d Declaratory Judgments, page 849, § 11. "No proceeding lies under the declaratory judgment act to obtain a judgment which is merely advisory or which merely answers a moot or abstract question. In other words the courts have no jurisdiction to deal with the theoretical problems, academic matters or hypothetical or speculative questions." 22 Am.Jur.2d 848, § 10.

The record in this case does not disclose that the holder of the mineral right has attempted to or has any present plans to excavate all or any part of the property in question. For this reason, I can not perceive how this court can in an action for declaration of rights completely define the rights of all parties concerned in a controversy that may never develop. This court has previously refused to do so.

In Shearer v. Backer, 207 Ky. 455, 269 S.W. 543, we said:

"After appellants have accepted a warranted title, and are in full and undisputed possession of the land, what may or may not happen to their title or possession is simply a speculative argument that does not now and may never become an actual controversy about rights or duties, and it was not the purpose of the Declaratory Judgment Act to impose upon the courts the burden of answering such abstract and speculative propositions of law simply to satisfy the curiosity or fears of the parties about possible controversies that may or may not arise out of their executed contract."

Again in Jefferson County ex rel. Coleman v. Chilton, 236 Ky. 614, 33 S.W.2d 601, we said:

"The Declaratory Judgment Act refers to justiciable controversies of a character to be determined by a single decree or supplemental proceedings thereon. Every dispute between lawyers on a subject of law, whether adjective or sub-stantive, is not a justiciable controversy to be settled in a declaratory action. 'A mere difference of opinion is not an actual controversy,' within the contemplation of our statute. Axton v. Goodman, 205 Ky. 382, 265 S.W. 806. Cf. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246. Nor is a disputed question of law or procedure raised in a pending suit such an actual controversy as comes within the letter, reason, or spirit of the Declaratory Judgment Act."

There being no present controversy between the parties and none likely to arise until such time as a determination is made to excavate, I would dismiss this action.

EDWARD P. HILL, Judge (dissenting).

I dissent from the majority opinion.

This case presents a question of the interpretation of a deed executed December 29, 1905, known and designated as "broad form" or "northern" deeds. These deeds, including the one in question, give the owner of the coal the right to use the surface for any and all purposes "deemed necessary" by the grantee to remove the coal. In a number of counties uniform blank deeds were used so that only the description and the name of the grantor were required above the certificate of the acknowledging officer. In many instances deed books were ordered by the clerk at the request of the mineral purchasers. I mention the foregoing circumstances in connection with the so-called rule that a deed should be construed against the grantor.

The question here is whether the grantee may use *mining methods (stripping)* not known or contemplated by the parties at the time the deed was made to such an extent as to destroy the surface rights of the grantor.

By every rule of contract construction, including construction of deeds, the intention of the parties is the ultimate quest of the interpreter. 17A C.J.S. Contracts

§ 295. The authorities supporting this proposition are so legion I consider it unnecessary to cite further authority except to say that this jurisdiction has followed the universal rule announced in Parrish v. Newbury, Ky., 279 S.W.2d 229, 233, wherein this court said: "Notwithstanding these general rules, always, as a fundamental and supreme rule of construction of contracts, the intention of the parties governs."

What was the intention of the parties in 1905? This question provokes another question, What were the usual, known, and accepted mining methods at that time? Certainly strip mining was then unknown and unaccepted. I find a note in Kentucky Law Journal, volume 50, page 525, note 5, which states:

"Strip mining was of no importance until 1914 but 'knob' or 'channel' coal was mined near Cumberland Lake, Kentucky about 1927. These early operations used picks, shovels, and slip-scrapers drawn by mules to remove the *thin* overburden." (Emphasis added.)

Strip mining was neither heard of nor dreamed of in 1905 in Knott County, the locality of the coal land in question. There was no railroad in Knott County until long thereafter. Neither was there a navigable stream in that county. About the only coal mined in those days was from the outcroppings in creek beds, where a small quantity was obtained by the use of a newfound tool—the coal pick.

I contend first that inasmuch as the parties to the "broad form" deeds never contemplated the use of the then unknown method of strip mining and never dreamed of the cataclysmic destruction of the surface, the grantee and his successor in title have no right to remove the coal by stripping methods. Secondly, I contend that if rules of construction are so modified and distorted as to authorize the grantee to use stripping methods, he should be answerable in damages to the surface owners for just compensation.

I shall first show that the majority opinion is erroneous and without precedent, either at home or abroad.

I concede that prior to the decision in Buchanan v. Watson, Ky., 290 S.W.2d 40 (1956), there was a long line of cases by this court holding that the grantees under similar "broad form" deeds had a right to use the surface for any purpose "deemed necessary or convenient" by the grantee. However, all those cases prior to Buchanan involved deep-mining methods, which was the method of mining contemplated by the parties in 1905. But Buchanan really got out in left field when it ignored and disregarded all the rights of the surface owner. This court on many occasions recognized that the surface owner had at least some semblance of right when it held that the owner of the coal must leave pillars of coal to support the surface. 58 C.J.S. Mines and Minerals § 159 c; Jenkins v. Depoyster, 299 Ky. 500, 186 S.W.2d 14; Wells v. North East Coal Company, 274 Ky. 268, 118 S.W.2d 555; H. B. Jones Coal Company v. Mays, 225 Ky. 365, 8 S.W.2d 626; and North-East Coal Company v. Hayes, 244 Ky. 369, 51 S.W.2d 960.

Not only is the majority opinion contrary to the laws of sister coal states, such as West Virginia and Pennsylvania, as I shall point out later, but the majority opinion is inconsistent with other opinions of this court in similar situations. This court decided in Wiser Oil Company v. Conley, Ky., 346 S.W.2d 718 (1960), that the owner of oil and gas rights had no right to use the water-flooding method of recovering oil without the consent of the owner of the surface. This court said in Wiser at page 721:

"Even though appellants assert that the water-flooding process was known prior to March 10, 1917, the date of execution of the lease, and was employed to some extent in other states before that time, *we conclude it was the intention* of the parties that oil should be produced by drilling in the customary manner *that prevailed when the lease was executed.* Any

exemption from liability would therefore be limited to the damages which might be caused by this *contemplated* means of bringing oil to the top." (Emphasis added.)

Wiser and Buchanan are as inconsistent as sin and salvation.

I am shocked and appalled that the court of last resort in the beautiful state of Kentucky would ignore the logic and reasoning of the great majority of other states and lend its approval and encouragement to the diabolical devastation and destruction of a large part of the surface of this fair state without compensation to the owners thereof.

Following is a list of some of the cases from six other states that take a view contrary to the majority opinion in the present case. Franklin v. Callicoat, Ohio Com.Pl., 68 Ohio Law Abst. 67, 119 N.E.2d 688; East Ohio Gas Company v. James Brothers Coal Company, Ohio Com.Pl., 85 N.E.2d 816, 53 Ohio Law Abst. 438; Williams v. Hay, 120 Pa. 485, 14 A. 379; Livingston v. Moingona Coal Company, 49 Iowa 369, 31 Am.Rep. 150; Catron v. So. Butte Mining Co., 9 Cir., 181 F. 941, 104 C.C.A. 405; Oresta v. Romano Brothers, 137 W.Va. 633, 73 S. E.2d 622; West Virginia-Pittsburgh Coal Company v. Strong, 129 W.Va. 832, 42 S.E. 2d 46; Rochez Bros., Inc. v. Duricka, 374 Pa. 262, 97 A.2d 825; Chesapeake & Ohio Railroad Company v. Bailey Production Corporation, D.C., 163 F.Supp. 666; Campbell v. Campbell, 29 Tenn.App. 651, 199 S. W.2d 931; United States v. Polino, 131 F. Supp. 772 (N.D.W.Va.1955); Wilkes-Barre Township School District v. Corgan, 403 Pa. 383, 170 A.2d 97 (1961); Rocky Mountain Fuel Co. v. Heflin, 148 Colo. 415, 366 P.2d 577 (1961); Benton v. United States Manganese Corp., 229 Ark. 181, 313 S.W.2d 839 (1958).

I cannot bring myself to the conclusion that it was the intention of the parties at the time the minerals were reserved to permit the owner of the minerals to completely destroy the surface of the farm which is now owned by the defendants.

I confess I think strip mining without proper reclamation procedures is a catastrophe. I consider it against public policy and detrimental to the general welfare of the state, and any contract pertaining thereto is illegal as being against public policy. Of course, where the land is not steep and proper reclamation practices are followed, strip mining may be justified.

The public policy of the state of Kentucky was accurately expressed by the Legislature in KRS 350.020, from which I quote:

"The General Assembly finds that the unregulated strip mining of coal causes soil erosion, stream pollution, the accumulation of stagnant water and the seepage of contaminated water, increases the likelihood of floods, destroys the value of land for agricultural purposes, counteracts efforts for the conservation of soil, water and other natural resources, destroys or impairs the property rights of citizens, creates fire hazards, and in general creates hazards dangerous to life and property, so as to constitute an imminent and inordinate peril to the welfare of the Commonwealth."

I recognize that the regulation of strip mining is not for the courts but for the Legislature. However, I would go further and say as a matter of law that any deed, whether it be "broad form" or otherwise, that attempts to grant strip mining (when the grade is approximately 20 degrees or more) is illegal and unenforcible as against public policy and detrimental to the present and succeeding generations.

I freely recognize and respect the rule of *stare decisis*, and I oppose changing rules of law without compelling reasons, but it is wrong and unjust to take the position that once judicial error has gained the respectability of age it becomes somehow invulnerable to correction by the court which made it.

Although the majority opinion relies upon Buchanan and zealously guards its borders on all sides from every change, modification, or encroachment, I am able to see a ray of hope in Buchanan which is overlooked, ignored, and disregarded by the majority opinion. This ray of hope is contained in the following quotation from Buchanan, supra, 290 S.W.2d at page 43:

> "The owner of the mineral has the paramount right to the use of the surface in the prosecution of its business for any purpose of necessity or convenience, unless this power is exercised *oppressively,* arbitrarily, wantonly, or maliciously, in which event the surface owner may recover for damages so occasioned."

Webster's Third New International Dictionary defines "oppressive" thus: "unreasonably burdensome; unjustly severe, rigorous, or harsh."

I contend that any major destruction of the surface is "unreasonably burdensome; unjustly severe" and "harsh." But no, the opinion of the majority of this court, as now constituted, would not afford the appellants herein the benefit of the plain and simple meaning of its own precedent. In the interest of consistency, the majority opinion should reform the rule in Buchanan so as to delete the word "oppressive" therefrom and should overrule its opinion in Wiser Oil, then the slate would be clean insofar as the legal status of a few greedy exploiters of the land is concerned.

I would point out that in Buchanan, supra, this court shed great crocodile tears for the coal industry when the opinion said: "To disturb this rule now would create great confusion and much hardship in a segment of an industry that can ill-afford such a blow." Obviously the court was grieving for the coal industry. Instead of helping the coal industry, the rule in Buchanan really hurt it by helping a few strip and auger operators. It was said in Kentucky Law Journal, volume 50, number 4, page 529 that: "Contrary to the implication of the court's conclusion, Buchanan helped the holding companies more than the 'industry.'"

With this further compliment, I leave Buchanan to the strip and auger operators. They (the operators) have shown in actual practice such little regard for the justice and fairness of Buchanan that they have not had the heart to take advantage of their legal windfall safeguarded and guaranteed by the rule in Buchanan and have in many cases been compensating the surface owner for "oppressive" damages done the surface owner.

The majority opinion attempts to justify the harsh rule applied in this case by comparing the value of the consideration paid for the mineral to the assessed value of the surface at the date of the deed. This is a poor comparison when it is universally recognized that in this state land values were assessed at 10 to 15 percent of their market value until recently.

I would affirm the judgment of the trial court and go further and hold that the grantee has no legal right to strip or auger mine coal under the deed in question.

MILLIKEN, J., joins in this dissent.