COMMERCE UNION BANK et
al., Appellants,

v.

James C. KINKADE et al., Appellees.

Supreme Court of Kentucky.

May 28, 1976.

Rehearing Denied Oct. 15, 1976.

William P. Donan, Donan & Vick, Green-ville, William A. Logan, Logan, Gordon & Logan, Richard L. Frymire, Moore, Morrow, Frymire & McGaw, Madisonville, for appel-lants.

B. R. Paxton, Paxton & Kusch, Central City, Ralph W. Wible, Sandidge, Holbrook, Craig & Hager, Owensboro, for appellees.

PER CURIAM.

Commerce Union Bank, Trustee of Justin Potter's Grandchildren's Trust; Island Creek Coal Company; and Badgett Mine Stripping Corporation appeal from a judgment of the Muhlenberg Circuit Court holding that certain mineral conveyances did not grant the right to mine the coal by the strip or open-pit method.

Commerce Union Bank, Trustee, owns the coal in controversy. Island Creek is lessee of all the coal owned by the bank, and Badgett is sublessee of the No. 11 vein or seam and all veins or seams above No. 11. Kinkade (4 acres), Harper (45 acres), and Gray and Armstrong (35 acres) own the surface over this coal.

In an action filed by the surface owners against the mineral owner and lessees, it was stipulated as follows:

"Plaintiffs do not seek a declaration that the defendants have no rights of any kind in the surface of the real estate. The only issue concerning the mineral severance in this action is whether the grant to the mineral owner precludes the mining of minerals therefrom by the strip method of mining."

Island Creek conceives the issue to be:

"The principal question to be decided on this appeal upon the record as it now exists is whether the language included in the deeds * * * grants to the appellants, owner, lessee and sublessee, the right to mine the coal within and underlying the appellees' property by the strip or open pit method of mining, upon the payment of the sum set forth in the severance deeds for each acre used for that purpose."

The contested mineral severances read in part as follows:

*Minerva S. Jarvis to Elijah Bassett, February 21, 1906*

" * * * has bargained and sold and by these presents does bargain sell and convey unto the party of the second part his heirs successors and assigns all the coal and the coal mining privileges in and under the following described tract or parcel of land * * *."

* * * * * *

"The party of the second part, his heirs successors and assigns, shall take under this deed the perpetual right to mine and take from under the land hereinabove described all coal that may be in and under the same and dispose of said coal as he or they see proper and is, granted the right, to enter upon said land for the purpose of opening mines and the right to ingress and egress on and beneath the surface to and from any mine opened by the party of the second part, or his successors in title and the right to such surface space as may be necessary in mining operations including the Right of Way for and Railroad that may be necessary for the transportation of said minerals, and for such surface space as it may take for the purpose aforesaid said party of the second part or his successors in title agree to pay before taking same and the party of the first part for herself and her successors in title agrees to accept the sum of thirty dollars per acre if any of said land shall be damaged in mining operations of the party of the second part or his successors he or they shall pay the then owner of the surface of said land at the same rate per acre for the portion so damaged."

*J. F. Gish to Elijah Bassett, June 30, 1906*

" * * * have bargained and sold and by these presents, do bargain sell and convey unto the party of the second part his heirs successors and assigns all the minerals except oil, gas and water with the mining rights and privileges in and under the following described tract of land, * * *."

* * * * * *

"The party of the second part, his heirs successors and assigns shall take under this deed the perpetual right to mine and take from under the land hereinabove described all the minerals heretofore conveyed, and dispose of said minerals as they may see proper, and is granted the

right to enter upon said land for the purpose of opening mines and the right of ingress and egress on and beneath the surface to and from any mine opened on said land by the party of the second part or his successors in title and the right to such surface space as may be necessary in mining operations including the right of way for any Railroad that may be necessary for the transportation of said minerals under and on said land and for such surface space as it may take for the purposes aforesaid said party of the second part or his successors in title agree to pay before taking same and the parties of the first part for themselves and their successors in title agree to accept, the sum of $fifty per acre if any of said land shall be damaged in mining operations of the party of the second part, or his successors he or they shall pay the then owners of the surface of said land at the same rate per acre for the portion so damaged."

*T. W. Martin to Elijah Bassett, February 23, 1906*

" * * * have bargained and sold and by these presents do bargain sell and convey unto the party of the second part his heirs successors and assigns all the coal and the coal mining privileges in and under the following described tract or parcel of land * * *."

\* \* \* \* \* \*

"The party of the second part his heirs, successors and assigns, shall take under this deed the perpetual right to mine and take from under the land hereinabove described all the coal that may be in and under the same and dispose of said coal as he or they see proper, and is granted the right to enter upon said land for the purpose of opening mines and the right of ingress and egress on and beneath the surface to and from any mine opened by the party of the second part, or his successors in title and the Right to such surface space as may be necessary in mining operations including the right of way for any Railroad that may be necessary, for the transportation of said minerals

and for such surface space as it may take for the purpose aforesaid. Said party of the second part or his successors in title agrees to pay before taking same and the parties of the first part, for themselves and their successors in title agree to accept the sum of thirty dollars per acre in any of said land shall be damaged in mining operations of the party of the second part or his successors, he or they shall pay the then owner of the surface of said land at the same rate per acre for the portion so damaged."

■■■ Although the early common-law requirement of *livery of seisin* was inconsistent with the passage of any fee interest in minerals in place as a separate estate, it is now well settled that a conveyance may separate minerals and surface into independent legal estates and that the mineral estates so created may be dealt with as any other fee interest in land. Any deed of minerals carries with it the right to use as much of the surface as may be reasonably necessary to exploit the minerals coupled with the duty of the mineral owner to act with due care to protect the surface owner's rights. Cf. *Wiser Oil Company v. Conley,* Ky., 346 S.W.2d 718 (1960).

■■■ While it is not unusual for the mineral deed to restrict even these implied rights, the trend within the industry has been to enlarge the grant to the extent that an owner may exploit the minerals on a more efficient and economical basis. Nevertheless, there must be a definite enlargement of specified mining rights in the instrument creating those rights before an owner may conduct mining operations contrary to the rights usually implied in a mineral grant. The enlargement of mining rights may be limited in character; yet at the other end of the spectrum we find some of the grants to be so extensive and all embracing that they are tantamount, in their effect, to grants of all surface rights. There seems to be no happy medium, nor is there any form of grant which may be generally said to reflect the norm of the industry. Realizing the potential fact that no two grants of mining rights may be

identical, it is necessary that a proper construction of such rights be confined to a deed-to-deed interpretation of clauses in a mineral deed which grant or modify mining rights.

 A mineral deed, while embracing the "reasonably necessary" right to use the surface, may further restrict mineral operations to a particular method or methods or, to be more specific, may prohibit mining operations in certain areas or by certain designated methods. If the language of the grant is sufficient to clearly delineate the rights of the surface owner and the mineral owner and thereby establish the method or procedure to be used in the recovery of the minerals, both the surface and mineral owners will be limited to the method or contractual obligation of the parties as thus determined. We have consistently upheld what has been identified as the "broad form" or "Mayo deed" and in so doing have concluded that these deeds grant such overwhelming mining rights that the mineral owner in fact has the right to use the surface of the land, part or all of it, in recovering the coal acquired by the deeds.

This court has reexamined those cases in which we have considered the "broad form" deed and has concluded that the mineral deeds involved in this proceeding, and as quoted herein, do not contain language that is so extensive as to subordinate the rights of the surface estate to the demands of the mineral estate. The language of the conveyances in each of the three deeds is such that it must be readily realized that there was no grant of rights necessary for removing the coal by the open-pit or strip method but rather the language expresses the granting of rights which are primarily those necessary in the conducting of an underground mining operation.

 The answer to the question now before us is very well stated in the court's opinion in *Peabody Coal Company v. Erwin,* U.S. Court of Appeals, 6th Circuit, 453 F.2d 398 (1971), wherein the court said:

> "Our view of the deed in this case indicates that it grants rights impliedly incident to underground mining but that it does not indicate the intention of the parties that the mineral owner bought the right to destroy the surface, or that it was intended that the mineral owner's rights to use the surface would be superior to any competing right of the surface owner."

The judgment is affirmed.

CLAYTON, LUKOWSKY, PALMORE and STERNBERG, JJ., concur.

STEPHENSON, J., concurs in result only by separate opinion in which JONES, J., joins.

REED, C. J., concurs in result only and files separate concurring opinion.

STEPHENSON, Justice (concurring).

I agree with the result in this case; however, I disagree with the manner in which this mineral deed is distinguished from the "broad form" mineral deeds.

This disagreement is based on an analysis of the authorities cited in *Buchanan v. Watson,* Ky., 290 S.W.2d 40 (1956). Here, as in *Buchanan,* the only feasible and economical method to mine the coal is by strip mining. *Buchanan,* in holding that the possessor of the mineral deed had the right to mine the coal by the method of strip mining, stated that "[t]he doctrine of stare decisis requires that we do not depart from the established rule." A good argument could be made now that *stare decisis* should govern in view of later cases based on *Buchanan,* but in my opinion the statement was clearly erroneous in 1956 when *Buchanan* was decided.

*Buchanan* is a perfect illustration of the mischief caused by an opinion which lifts a well-established and sound principle of law out of a prior opinion and cites it as authority in complete disregard of the factual situation in the cited cases.

Part one of *Buchanan* decided that the mineral holder had the right to strip-mine. From the legal myths that have grown up about the "broad-form" deeds, it has been assumed that the right to strip-mine was based on the rights granted the mineral holder in the "broad-form" deeds. Not so, *Buchanan* reached the conclusion that the

coal company had the right to strip-mine in a curious fashion without particular reference to the mining rights granted in the John C. C. Mayo deed in question. There is cited a Pennsylvania case summarizing a portion of the majority opinion holding that the owners of the mineral had a right to strip-mine and the method by which the coal was removed was incidental to the right to remove it. A portion of the dissent is also cited. Then *Buchanan* gives the reasoning for holding that the coal could be strip-mined at page 42:

> "*The deed by express language did not exclude or include this method of mining*, although the proof shows that such mining methods were known and had been used prior to the date of the deed. *It seems clear that the parties intended the conveyance of the coal. To deny the right to remove it by the only feasible process is to defeat the principal purpose of the deed.*

"We think the Chancellor correctly decided that since the appellant had the right to remove all of the coal in, on, and under the surface of this tract, the particular method contemplated by the parties (in the absence of language prohibiting other methods) does not preclude him from utilizing the only feasible process of extracting the coal. In *Rudd v. Hayden*, 265 Ky. 495, 97 S.W.2d 35, it was pointed out that 'mining' is not limited to the sinking of a shaft but may include other methods, including strip, which may be necessary to take possession of and remove the minerals conveyed." (Emphases added.)

*Buchanan* clearly holds that if strip mining is the only feasible means of removing the coal, then the mineral owner has the right to strip unless the mineral deed prohibits strip mining. In passing, it would appear that this principle fits the instant case precisely. *Rudd* deciding an unrelated matter defined mining, for what this definition is worth, by saying "strip" is a method of mining. It did not anywhere in the opinion base the definition on the "method which may be necessary to take possession and remove the minerals conveyed." Hy-

draulic mining also is included in the definition. I am unable to grasp the reasoning that would include this as authority for holding that the owner of the mineral has the right to strip-mine the coal.

Then *Buchanan* proceeds to pose the next question: "Having decided that appellant is entitled to 'strip mine' the coal, when is he liable to the surface owner for damage for destruction of the surface or the growing timber thereon?"

It is interesting that this right is not based on any authority in this jurisdiction, so I am not impressed with the statement on *stare decisis*. It is on the question of damages that the "broad form" deed comes into play, and it is here that sound authorities are distorted beyond recognition.

The reasoning in *Buchanan* is divided into three parts.

Part one is as follows:

> "Two fundamental rules for construction of deeds are set forth in *McIntire v. Marian Coal Co.*, 190 Ky. 342, 227 S.W. 298, 299. They are:
>
> "'* * * that a deed which grants land and certain specified rights and privileges, there being no ambiguity in the instrument, will be construed according to its terms, and enforced strictly according to its terms. But, where there is ambiguity or uncertainty in the deed, it will be construed most strongly against the grantor and in favor of the grantee.
>
> "'* * * that the instrument shall be construed most strongly against the grantors and in favor of the grantee both upon the grant of the property and the rights and privileges specified.'
>
> "See also *Cornett v. Louisville & N. R. Co.*, 298 Ky. 95, 182 S.W.2d 230; *Isaacs v. Inland Steel Co.*, 305 Ky. 777, 205 S.W.2d 681; *Clements v. Morgan*, 307 Ky. 496, 211 S.W.2d 164. In the *Cornett* and *Isaacs* cases, the deeds were very similar to the deed under consideration."

*McIntire* involved a "broad-form" deed, and the opinion stated, "*there being no ambiguity in the instrument*, will be construed according to its terms," and held

that the coal company had the right to erect and maintain houses, tipples, stores, roads or other structures used in connection with its mining lease.

*Cornett,* in its opinion construing a "broad-form" deed, found *no ambiguity* in the instrument and held that the coal company had the right to build a railroad to its mine as provided in the mineral deed.

*Isaacs* held that the landowner did not prove that the mining operation caused damages to a two-acre reservation in the mineral deed and for some obscure reason quoted the above principle of law from *McIntire.*

*Clements* construed a deed containing this language, "coal and mineral privilege sold."

I see no authority here that would be helpful in making a decision on liability for damage and have yet to see any ambiguities in the "broad form" deed.

Proceeding to part two, *Buchanan* states a fundamental rule:

"The rights of the respective owners of the surface and of the minerals underneath in similar deeds have been determined and declared. The owner of the mineral has the paramount right to the *use* of the surface in the prosecution of its business for any purpose of necessity or convenience, unless this power is exercised oppressively, arbitrarily, wantonly, or maliciously, in which event the surface owner may recover for damages so occasioned. *McIntire v. Marian Coal Co.,* 190 Ky. 342, 227 S.W. 298; *Case v. Elk Horn Coal Corporation,* 210 Ky. 700, 276 S.W. 573; *Collins v. Lackey Mining Co.,* 219 Ky. 31, 292 S.W. 1091; *Pike-Floyd Coal Co. v. Nunnery,* 232 Ky. 805, 24 S.W.2d 614; *Wells v. North East Coal Co.,* 255 Ky. 63, 72 S.W.2d 745; *United Carbon Co. v. Webb,* 282 Ky. 79, 137 S.W.2d 733; *Treadway v. Wilson,* 301 Ky. 702, 192 S.W.2d 949; *Elk Horn Coal Corp. v. Johnson,* Ky., 249 S.W.2d 745, second appeal Ky., 263 S.W.2d 124." (Emphasis added.)

*McIntire* involved a deep-mine operation and stated that the mineral estate is domi-

nant and superior, but should the coal company take improvements on the surface, such taking would have to be after satisfaction or adjudged compensation for such improvements, then went on to say that the company could not use the surface for any other purpose not *specifically granted by the deed* or reasonably to be inferred from the nature and terms of that instrument.

*Case* construing a "broad form" deed stated that the coal company has the paramount use of the surface unless it exercised its power oppressively, arbitrarily, wantonly or maliciously and that the coal company had a right to locate and construct an electric transmission line over the surface for the operation of a deep mine.

*Collins* cited *Case* as to paramount use of the surface but found that the coal company had acted capriciously and not in good faith and ordered the coal company to remove homes constructed on surface owners' land to house miners engaged in mining coal on other properties.

*Pike-Floyd Coal Co.,* in construing a "broad form" deed cited *McIntire* on construction, stated that there was no ambiguity in the deed and held the coal company liable for damages for dumping refuse from another deep-mine operation on the surface covered by the mineral deed.

*Wells* cited *Case* and *Pike-Floyd.* The opinion discussed the evidence of claimed damages and the elements, such as building electric power lines and other activities of a deep-mine operation clearly authorized by the specific terms of the "broad form" deed in question.

*United Carbon* dealt with a claim for damages during the course of drilling a gas well. The surface owners claimed a trespass, and the court citing the above cases set out the rights under a mineral deed and found that the surface owner did not plead or prove exercise of the rights in an arbitrary, oppressive, or malicious manner.

*Treadway* held that the mineral owner had the right to strip mine, citing *Case, Pike-Floyd,* and *Wells.*

The opinion reversed the trial court for refusal to permit the filing of an answer averring that the coal could be mined by deep-mining methods and that strip mining would be oppressive. The reversal directed the trial court to hear evidence on the issue and determined the rights of the parties accordingly.

*Elkhorn Coal Corp.* involved a claim for damages for subsidence of the surface. The opinion found that the right to support had been waived by the express terms of the mineral deed and reversed with the remark that if there was evidence of arbitrary, wanton, or malicious conduct, on retrial the question should be submitted to a jury.

Part two will be discussed with part three below.

"The validity and enforceability of a waiver of damages have been recognized as well as that of such grants of mining rights just discussed. The only qualification imposed in exercising these rights with respect to any given situation is that in order to be relieved of liability for damages, the rights must not be exercised arbitrarily, wantonly, or maliciously. *Himler Coal Co. v. Kirk,* 205 Ky. 666, 266 S.W. 355; *Kentucky West Virginia Gas Co. v. Crum,* 258 Ky. 508, 80 S.W.2d 537; *Inland Steel Co. v. Isaacs,* 283 Ky. 770, 143 S.W.2d 503; *Trivette v. Consolidation Coal Co.,* 296 Ky. 529, 177 S.W.2d 868; *Isaacs v. Inland Steel Co.,* 305 Ky. 777, 205 S.W.2d 681."

In *Himler* the severance deed conveying the surface and reserving the minerals did not reserve any mining rights, and the opinion enunciated the basis for the *dominant* theory of the mineral estate. "Its reservation of the minerals in the conveyance to Barrett necessarily reserved to it and its grantees the right to dig through the surface to the minerals, to mine them in such way and in such quantities as not to destroy the support of the surface, to bring these minerals to the surface, and transport them over the surface from the opening to the market. Such rights are absolutely necessary to the reasonable enjoyment of the minerals reserved." The opinion held that the owner of the mineral had a right to construct a railroad over the surface, but that the construction was a way of convenience, not a way of necessity. The case was reversed for a trial on the damages to the surface if the mineral owner took any of the surface for which there was not a strict necessity. The opinion does not mention any "waiver of damages."

In *Kentucky West Virginia Gas Co.,* involving a John C. C. Mayo mineral deed, the opinion observed that there was no effort to prove that the gas company in drilling its well and laying pipelines performed any of these operations in an arbitrary, wanton, or malicious manner. The opinion held that the surface owner could recover for destruction of crops and fencing. Also recovery was allowed for timber cut by the company which was not reasonably necessary in the exercise of its rights.

In *Inland Steel,* construing a "broad form" deed, the opinion stated that "the mining company had the right, as defined in its mineral deed, to discharge the water on [the surface] as might be 'necessary or convenient.' Such rights may not be exercised 'arbitrarily, capriciously, oppressively or wantonly,' but must be exercised with due regard to and consistent with the interest and rights of the owner of the surface."

In *Trivette,* involving what appears to be a "broad form" deed, the opinion held that the coal company had the right to construct an electric transmission line over the surface. The opinion observed that the coal company made every effort to select a location for the line which would disturb the least quantity of timber. There was no issue of damages in the case.

*Isaacs,* cited in part one, stated that the coal company would not be liable for any injuries to the land which were caused by its normal mining operation.

The principle of creating separate mineral and surface estates by deed brought with it the problem of delineating the rights of the owners of the separate estates.

The theory of the mineral estate being *dominant* evolved to take care of a situation like that presented in *Himler* where no mining rights were reserved. In those situations, the installation and operation of a deep mine and its *use* of the surface were limited to operations and installations considered to be necessary as opposed to convenient but not necessary. In the mineral deeds reserving mining rights, the coal company was not so limited, depending on the express rights reserved or granted. Examples of rights that must be expressly granted to absolve the coal company of liability for damages are subsidence rights and the right to use timber for the mining operation. *Buchanan* did not discuss the "subsidence" cases, none of which have been overruled. In my opinion, it is wildly inconsistent to have a rule of law that renders a deep-mine operator liable for damages if the company removes coal pillars and causes the surface to subside in the absence of an express grant to do so, and say, as in *Buchanan*, that the holder of the mineral deed can completely destroy the surface by strip mining.

It is significant that each case cited in parts one, two, and three in *Buchanan*, with the exception of *Treadway*, recited principles of law applicable to the deep-mining operation involved in the case.

These sound and practical principles of law in every instance represent an effort by the court to permit the maximum enjoyment of the owner of each separate estate, consistent with the rights of the other owner. There is a thread running through all these opinions and that is the exercise of express, necessary or convenient rights by the holder of the mineral estate should not interfere more than reasonably necessary with the full enjoyment of the surface estate. By fiat *Buchanan* destroyed this carefully structured balance and in application of these rules to a strip-mining operation, distorts the rules out of all meaning. *Buchanan* and the later cases up to and including *Martin v. Kentucky Oak Mining Co.,* Ky., 429 S.W.2d 395 (1968), pay lip service to the doctrine of separate estates, but the holdings result in the practical effect of saying that the mineral estate is not only *dominant* but *exclusive* in that no real right to enjoy is left to the surface estate. I say this for the reason that I cannot visualize an estate that has any rights reserved to it when it can be stripped and completely destroyed. *Martin* reasoned that since "the landowners who executed the broad form mineral deeds at the turn of the century were paid prices which substantially or in large part equaled the full value of the land (at least of the hillside land) we see nothing unfair, unjust or inequitable in construing the deeds in favor of the grantees. Certainly the fact that the surface of the land is worth much more today than it was in 1905 is not a valid reason for saying that the landowners should be paid again." The opinion further states, "the landowner was being paid, for the mineral rights alone, practically the full value of his land."

The logical deduction from this reasoning is that the price paid for the mineral estate determines the rights of the surface owner, and since he received full value, the concept of two separate estates vanishes and there remains only one. *Buchanan* did say that "the deed created two separate and distinct estates."

In my opinion, this represents an astonishing line of reasoning. I have not found a prior case holding that the price paid for the mineral estate determined the rights of the surface estate. I have not searched for one either. If there is one, I do not want to know about it.

Parts two and three of *Buchanan* discuss the right to *use* the surface unless the right is exercised oppressively, arbitrarily, wantonly, or maliciously. This rule evolved as a standard to test "necessary and convenient" mining rights, and by any test limited the coal company to a prudent exercise of the rights so as to not give it a license to use or destroy the surface. Insofar as the installation of the deep mine and its operation is reasonable, the coal company is not answerable in damages *unless* it involves taking or damaging improvements as set out in *McIntire*. See also my concurring opinion in

*Kentland-Elkhorn Coal Company v. Charles,* Ky., 514 S.W.2d 659 (1974).

This runs through all the cases cited in *Buchanan* and confirms my opinion that the "waiver of damages" in the "broad form" deed is superfluous. How these principles can apply as stated in *Buchanan* is beyond my comprehension. If the holder of the mineral deed has a right to strip-mine and to completely destroy the surface, how can he exercise this power oppressively, arbitrarily, wantonly, or maliciously?

I am not at all impressed with the mystique that has attached to the "broad form" deeds. Expressions such as "overwhelming rights" and "grants so extensive and all embracing that it is tantamount, in its effect, to a grant of all surface right" as recited in the opinion here leave me with a feeling that indeed such a document should contain strange and wonderful language, but I find none. The "broad form" deeds in all their manifestations clearly and expressly provide for those installations and operating procedures routinely found in a deep mine. With the occasional inclusion of "subsidence rights" and more frequently the express rights to use standing timber of a certain size in the mining operation, all else is usual in a deep-mine operation. The fact that the scrivener felt some compulsion to go into tedious and minute detail in describing the degree of significance that has been ascribed to them.

After *Buchanan* somehow the idea evolved that the right to strip-mine was found in the "broad form" deeds. There is not a case in this jurisdiction that has found any ambiguity in the language of the "broad form" deeds. *Buchanan* stands for the proposition that the right to strip-mine, unless specifically excluded, is an incident to the ownership of the coal if that is the only feasible and economical method of removal.

*Treadway,* decided in 1946, made a quantum leap in holding that the mineral owner had the right to strip-mine for the reason that the mineral owner has the paramount right to the use of the surface, citing *Case, Pike-Floyd Coal Co.,* and *Wells. Buchanan* did not cite *Treadway* as authority for the right to strip-mine. *Treadway* based its holding on a misunderstanding of the rule in the cases cited therein. The opinion reversed the trial court for not permitting to be filed an answer alleging that stripping would be "oppressive" and sent the case back for trial on that issue. We hear no more from *Treadway.*

The difficulties that arise from attempting to apply rules of law lifted out of one factual situation and wedged into a completely different factual situation is well illustrated by *Martin's* treatment of the opinion in *Wiser Oil Company v. Conley,* Ky., 346 S.W.2d 718 (1961). If *Buchanan* and the later cases are correct and the same reasoning applied, *Wiser* should have been decided differently. *Martin* declined to reconcile or distinguish *Wiser* in my opinion for the good and sufficient reason that it could not by any logical test.

In my opinion, *Treadway, Buchanan* and their progeny are aberrations in the law of minerals. They should be overruled, and the right to strip-mine should be limited to those mineral deeds specifically granting or reserving such right; otherwise, the consent of the surface owner should be necessary. This would once again give effect to those cases which structured the respective rights of the owners of the mineral estate and the surface estate.

JONES, J., joins in this concurring opinion.

REED, Chief Justice (separate concurring opinion).

The opinion of Justice STEPHENSON is an excellent analysis of the development of mineral law that culminated in the unfortunate decision in *Buchanan v. Watson.*

My main concern is in giving a retrospective effect to the overruling of *Buchanan.* The reliance of parties on the law as specifically pronounced has especial significance in voluntary relationships between parties concerning property rights. I have no hesitation in applying Justice STEPHENSON'S decision prospectively. I could not, how-

ever, destroy the property rights of parties who entered into voluntary relationships in the light of plainly expressed existing law.

Strict regulation and application of our nuisance theory approach are not, in my judgment, an impingement on the existing legal expectations of parties who acquired their rights under existing laws.