**Marion TAYLOR and Patty Taylor, Appellants,**

v.

**COAL–MAC, INC., Triple Elkhorn Mining Co., Inc., CSX Minerals, Inc., and George Barnett, Appellees.**

**No. 91–CA–389–MR.**

Court of Appeals of Kentucky.

June 12, 1992.

Discretionary Review Granted
Feb. 10, 1993.

Rehearing Denied April 2, 1993.

Discretionary Review Denied Nov. 17, 1993.

John M. Rosenberg, Appalachian Research & Defense Fund, Prestonsburg, for appellants.

D.B. Kazee, Francis, Kazee & Francis, William S. Kendrick, Prestonsburg, for appellee, Coal–Mac, Inc.

James A. Combs, Combs & Stevens, Prestonsburg, for appellee, CSX Minerals, Inc.

Clifford B. Latta, Latta, Latta & Brown, Prestonsburg, for appellees, Triple Elkhorn Mining Co. and George Barnett.

Before HOWERTON, HUDDLESTON, and MILLER, JJ.

HOWERTON, Judge.

Marion and Patty Taylor appeal from a summary judgment in favor of Coal–Mac, Inc., Triple Elkhorn Mining Co., Inc., and CSX Minerals, Inc., who are mineral owners or lessees, and George Barnett, who was the previous surface owner of the property in question. Because we determine that the Taylors were the parties entitled to a summary judgment on the cross-motions, we reverse.

The Taylors are the surface owners of approximately 225 acres in Stumbo's Branch in Floyd County, for which they paid $6,000. They acquired the property by deed dated December 20, 1971, from George and Johnnie Barnett. This deed recited that Johnnie released her dower rights in the property, and she and George subsequently divorced. The Barnetts never owned the mineral estate, it having been severed from the surface by deed from Alex and Louisa Stumbo to Northern Coal and Coke Company in 1903. CSX is currently the owner of the mineral estate, having acquired it by deed in 1937. Triple Elkhorn leased the minerals from CSX in 1977, and Coal–Mac succeeded to this mineral lease.

A few months before Barnett sold the surface to the Taylors, he leased the surface rights for a period of two years to P.W.D. Mining Company, which had entered into a contract with Island Creek Coal, one of the mineral owners, to surface mine the coal. Furthermore, at the time of the conveyance from Barnett to the Taylors in December 1971, Barnett himself was operating a deep mine on the property pursuant to a contract with another mineral lessee, Triple Elkhorn.

When Barnett sold the surface to the Taylors, he reserved in the deed certain mining rights as follows:

There is reserved to George E. Barnette (sic) of first parties all mining rights and haulage rights in and to this property, including any rent or royalties due or to become due by reason of minerals sold or leased from this land, mining operations or hauling on or over this tract, the use of timber on this land for mining purposes on this tract by George E. Barnette (sic) only.

Since 1971, the Taylors have, at various times, attempted to prevent surface mining on their property. In 1981, Barnett signed an agreement permitting Triple Elkhorn to come on the property and surface mine and to use the property for hauling coal mined from adjoining tracts. In this agreement, Barnett identified himself as the owner of the surface. This agreement was for a period of 10 years, and Barnett was to be paid a "surface royalty" of $2,000 and 25¢/ton of coal mined.

When Triple Elkhorn applied for a coal mining permit with the Cabinet for Natural Resources and Environmental Protection (formerly Department), the Taylors objected and subsequently filed a complaint in the trial court seeking a declaration of rights as to the property and seeking injunctive relief prohibiting mining on their property. Ultimately, the trial court concluded that Triple Elkhorn had the right to deep or surface mine the property, that the mineral severance deed was a broad form deed, and that it was up to the legislature to make any changes in the law regarding such deeds. On appeal, the mineral owners or lessees and Barnett contended that the 1903 severance deed was a broad form deed, while the Taylors, using their best argument at that time, argued that the 1903 deed was not a broad form deed. Another panel of this Court

dismissed the appeal because the judgment was not final and appealable.

Nothing more happened until ratification of the so-called "Broad Form Deed Amendment" in November 1988. 1988 Ky.Acts Ch. 117 § 1; KY. Const. § 19(2). The Taylors then sought to file a supplemental complaint in the trial court asking that the appellees be limited to coal extraction by deep mining on their property. Upon cross-motions for summary judgment, the trial court found that the reservation was in the nature of a commercial easement for the purpose of developing the property for coal mining and concluded that Barnett effectively reserved all mining rights, that surface mining was a known method of mining in the area in 1971 when Barnett reserved mining rights in the deed, and that Barnett's rights are assignable to Coal–Mac. Following the trial court's denial of the Taylors' motion to alter, amend or vacate the judgment, this appeal was brought.

■ The Taylors argue that the trial court's determination that the Barnett reservation authorized him to grant rights to the surface was error. We agree. Until the passage of the "Broad Form Deed Amendment" in 1988, the state of the law in Kentucky was such that when the surface and mineral estates were severed, the mineral estate was considered the dominant estate with a concomitant right of access through the surface to extract the minerals. *Akers v. Baldwin*, Ky., 736 S.W.2d 294, 297 (1987); *McIntire v. Marian Coal Co.*, 190 Ky. 342, 344, 227 S.W. 298 (1921). With a broad form deed, which was a method of conveying the minerals commonly used at the turn of the century, the mineral owner was authorized to use so much of the surface as he deemed "necessary or convenient for the full and free exercise and enjoyment of the minerals conveyed." *Akers*, 736 S.W.2d at 298. The surface owner would usually make some reservation of the land for agricultural purposes or for some of the timber, but the mineral estate was deemed the dominant estate. *McIntire, supra.* This has been interpreted through the years to give the mineral owner the right to destroy the surface if necessary, so long as his actions are not wanton, arbitrary, oppressive, or malicious. *Akers,* 736 S.W.2d at 305; *Case v. Elk Horn Coal Corp.,* 210 Ky. 700, 704, 276 S.W. 573 (1925); *Buchanan v. Watson,* Ky., 290 S.W.2d 40, 43 (1956), *overruled on other grounds, Akers,* 736 S.W.2d at 305; *Martin v. Kentucky Oak Mining Co.,* Ky., 429 S.W.2d 395, 399 (1968), *overruled on other grounds, Akers,* 736 S.W.2d at 305.

In spite of the fact that a few of the older cases made mention of compensation to the surface owner for damages, *McIntire,* 190 Ky. at 347, 227 S.W. 298, it was not widely held until *Akers v. Baldwin* was decided that the surface owner could collect for damages to his property so long as the mineral owner or lessee did not act wantonly, maliciously, oppressively, or arbitrarily. *Id.,* at 305. *Akers* overruled that part of *Buchanan* which had upheld a waiver of damages provision in broad form deeds. *Akers,* 736 S.W.2d at 305; *Buchanan,* 290 S.W.2d at 43.

*Akers* specifically struck down as unconstitutional KRS 381.940 which had set forth a rule of construction for mineral deeds. KRS 381.940 provided that in instruments subordinating the surface estate to the mineral estate, in the absence of clear and convincing evidence to the contrary, the intentions of the parties to the instrument were that the coal was to be extracted only by those methods in common use in the area at the time the instrument was executed. The statute eliminated the presumption that the mineral estate would be dominant to the surface estate. After *Akers* was decided, the voters of Kentucky ratified the KY. Const. § 19(2) on November 8, 1988. It reads:

(2) In any instrument heretofore or hereafter executed purporting to sever the surface and mineral estates or to grant a mineral estate or to grant a right to extract minerals, which fails to state or describe in express and specific terms the method of coal extraction to be employed, or where said instrument contains language subordinating the surface estate to the mineral estate, it shall be held, in the absence of clear and convincing evidence to the contrary, that the intention of the parties to the instrument was that the coal be extracted only by the method or methods

of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed, and that the mineral estate be dominant to the surface estate for the purposes of coal extraction by only the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed.

The Amendment created no new mining rights; it merely adopted a rule of construction regarding broad form deeds.

Many mineral owners paid "surface royalties" to the surface owner merely to avoid litigation. These "royalties" were simply a method of computing damages which the two estate owners would agree on, and not payment for the minerals themselves, even though they may have been based on a price per ton for minerals extracted. They were in lieu of payment for damage to the surface and were also paid for haulage rights for coal mined on the property or from adjacent tracts. When the mineral estate was severed by a broad form deed, these payments were gratuitous. It was such "royalties" that Barnett attempted to retain for himself even though he was selling the surface estate. Since the broad form deed no longer gives the mineral estate owner complete control of the surface, then control of the surface stays with the land. When Barnett divested himself of the surface, there could be no further damage or inconvenience to his property or interests. For the surface owner to be entitled to "surface royalties," he must either be in actual or constructive possession of the property. Barnett was in neither actual nor constructive possession after his conveyance to the Taylors.

The trial court characterized the 1903 deed as a broad form deed; that judgment has never been abrogated. We have examined the deed and agree. It grants broad rights to CSX and contains a waiver of damages clause. Since the right to control the surface passed to the mineral owner in 1903, Barnett had no rights to reserve. He had but a mere custom and practice of receiving payment for the use of the surface by the mineral owner or lessee. As such, it was unenforceable and

illusory. Thus Barnett had no right to prohibit deep or surface mining on this property prior to his sale to the Taylors in 1971. No right in the surface owner to limit the method of extracting the mineral was recognized until the ratification of the "Broad Form Deed Amendment." At that time, the Taylors owned the surface, and they alone had the right to restrict the use of the surface in mining. Barnett's attempted control is akin to a person who owns property and sells it, but attempts to retain a right to claim damages for trespass occurring after he has parted with the property. The previous owner is not the real party in interest to complain about trespass because he no longer has either actual or constructive possession of the property conveyed. The essence of trespass to real property is injury to the right of possession. *Ellis v. Beech Creek Coal Co.*, Ky., 467 S.W.2d 132, 133 (1971); 75 Am. Jur.2d *Trespass* § 25 (1991). We recognize that before the Amendment, the mineral owner's incursion was not a trespass because he had a right to use the surface pursuant to the broad form deed. Whether the receipt of damages was gratuitous or as a matter of right, it does not constitute a possessory interest or estate in land which can be reserved. *Cf. Ellis,* 467 S.W.2d at 133.

The trial court's characterization of Barnett's reservation as a commercial easement for the purpose of developing the property for coal mining was also error. "[O]ne of the features of an easement is the absence of all right to participate in the profits of the soil charged with it." 25 Am.Jur.2d *Easements and Licenses* § 4 (1966). This characterization does not change the fact that no right arose in any surface owner subsequent to severance of the surface and mineral estates in 1903 until the right to be compensated for damages was reinstituted in *Akers, supra,* and the right to prohibit mining by other than deep mining was created by the "Broad Form Deed Amendment."

There was also testimony at the trial court as to what the parties understood Barnett's reservation to mean, and whether it was ambiguous. The Taylors argued that Barnett had inserted the reservation to enable him to continue his operation of a deep mine

on the property and to protect his interests in a potential lawsuit against P.W.D. Mining Company for "surface royalties." Again, this is immaterial in light of our decision that the reservation had no effect. Nor do we need to decide whether the reservation was assignable. However, we would point out that Barnett never assigned the rights to grant permission to use the surface or the right to receive "royalties." These he attempted to retain in himself. When the mineral lessees changed, the payor changed, but Barnett's rights did not.

Furthermore, the trial court applied the "Broad Form Deed Amendment" to the 1971 deed and determined that since surface mining was in widespread use in the area in 1971, Barnett and the Taylors intended the reservation to include the right to extract minerals by surface mining. The amendment applies to the 1903 deed. The reservation in the 1971 deed was a nullity. The Taylors held title to the surface when the constitutional amendment was adopted, and it could only benefit them.

We do not find the argument concerning judicial estoppel to be persuasive. Each of the parties has changed its position somewhat from the initial complaint to adjust to changes in the law since 1983. In light of our disposition of this appeal, we decline to further address this issue.

Based on the above reasoning, we hold that Barnett's attempted reservation of "surface royalties" for use of the surface is of no effect because of the operation of the 1903 deed and the subsequent ratification of the "Broad Form Deed Amendment." We are aware that the land in question is not pristine, as parts of it have previously been surface mined even before the Taylors purchased it. Again, that is not determinative of the Taylors' rights to have some control of their surface.

We reverse the summary judgment favoring the appellees and direct that judgment be entered for the Taylors consistent with this opinion. We take judicial notice of the fact that surface mining was not in common practice in Floyd County in 1903. *Akers* took judicial notice of the fact that generally strip mining was nonexistent in the early

1900's. 736 S.W.2d at 308–309. The Taylors are entitled to all rights the "Broad Form Deed Amendment" affords them.

All concur.